b bs                    Proceedings              232

1      take final argument in any order that you wish.

2              Do you want to start, Mr. Iannuzzi?

3              MR.IANNUZZI:  Can we have about two minutes

4      before we start the argument?

5              THE COURT:  Sure, take whatever time you need

6      and let me know when you are ready.

7              MR.IANNUZZI:  Yes, sir.

8                      (pause)

9              MR.IANNUZZI:  Your Honor.

10             THE COURT:  Yes, Mr. Iannuzzi?

11             MR.IANNUZZI:  In connection with the hearing,

12     of course, I will not get into any aspects that are not

13     before the Court at this time, based on your Honor's

14     ruling, and limit myself to the voluntariness of the

15     statement both under the Huntley and Miranda

16     applications.

17             Basically I point out to the Court my view

18     that the evidence is insufficient to permit the Court

19     to utilize, or to permit the district attorney to

20     utilize the statement.  And I suggest to the Court that

21     the statements are the essence of the People's case,

22     and therefore scrutiny must be that more strict in a

23     situation where there is no other evidence except for

24     these statements.

25             In the first instance the defendant does have

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/22/14

THE CORBY GROUP 1-800-255-5040

COURT
EXHIBIT
2
1/22/2014

b  bs                    Proceedings              233

1       some minimal obligation to come forward, and we have

2       done that.  We have come forward, and it is the burden,

3       if you will, of the district attorney -- of the

4       Prosecution to justify, or vouch for the

5       constitutionality of the statements having been taken

6       in an appropriate fashion.  And I don't believe that

7       that has been shown in this case.

8               Indeed other than the fact that Detective

9       Bavolar gave a curbside opinion that he thought that

10      Mr. Millington was sufficiently aware of his

11      surroundings and what was happening, other than that

12      the Prosecution has come up with nothing whatsover to

13      establish that these statements were voluntarily and

14      knowingly given.

15              Now, without the defendant, of course, that

16      might have flown.  But the defendant, and the objective

17      facts, speak towards -- and the People and the police

18      had an obligation to do something more when they knew

19      that the defendant was inebriated, intoxicated, under

20      the influence of something -- alcohol, narcotics or

21      something to that effect.

22              They knew that because they picked him up at

23      4 or 5 o'clock in the morning after the hours that bars

24      had closed and allegedly he was still in the bar.

25              I say allegedly because the defendant

bs                    Proceedings              234

1   indicates that he had been kicked out of the bar at

2   some point that evening.

3           Was he in the bar, or was he in his car?  I

4   don't know.  But assuming that the story is that --

5   because they say they dragged him out of his car -- did

6   they see him come out of the bar, or was he in the

7   parking lot across the street in the car?  I don't know

8   that it makes a great deal of difference except from a

9   view of credibility.

10          But we do know he was under some influence at

11  that time.

12          Now we have to skip forward about five or six

13  hours, and we have to get to the point where the police

14  say that they took a statement from the Defendant

15  Millington, and that's People's Exhibit 6.  And the

16  statement indicates, or it purports to be a confession

17  to a crime that took place in July -- July 20th, I

18  believe, of the year 2000.

19          And in it the defendant indicates that at

20  that time -- that is to say at the time of the event--

21  he was drinking, smoking P.C.P. and taking cocaine.

22  And now they have apprehended somebody, who is

23  obviously under the influence of something, and they

24  have taken no steps whatever, despite the facilities of

25  the police department of the City of New York, and

LASER STOCK FORM FMU

THE CORBY GROUP  1 800 255-5040

b bs                    Proceedings          235

1       these are significant facilities -- for example, the

2       officer, or Detective Bavolar said, well, tell me where

3       you threw the gun and we can have SCUBA divers come

4       with a helicopter, jump into the water and search for

5       the weapon.

6               That would be significant because that would

7       be evidence.  So they can do that.

8               But when it came to determining was this

9       person, who was allegedly making a statement, fully

10      conscious, fully sober, capable of knowingly and

11      voluntarily making decisions in reference to Miranda,

12      knowingly and voluntarily capable of making decisions

13      in confessing to a crime, knowing that this evidence

14      was being taken for the purpose of it's integrity and

15      presentation in a court of law, they did absolutely

16      nothing with the person that they knew was inebriated,

17      except for Bavolar, who is a layman, to say, I thought

18      he was okay.  Yeah, he looked okay to me.

19              What does -- and with greatest respect for

20      Detective Bavolar -- what does he know about it?

21              Meanwhile I asked him if they had the

22      facilities, and he said in a cavalier fashion--and I

23      think the word cavalier will appear a couple of more

24      times--but in a very cavalier fashion, "Oh, the highway

25      department does that."

b bs                    Proceedings              236

1        They have the facilities to stop people

2   driving in the street and determine if they have point

3   zero one, point zero 2, point whatever to determine if

4   they violated the sections of the vehicular law, and to

5   arrest them for driving under the influence or while

6   intoxicated, depending on the amount.

7        And yet not a single thing was done.  How

8   hard would it be?

9        We don't do that.

10       Well, that's first of all.  I can't believe

11  it.  It is shocking.  It is shocking to think that the

12  police department would say, knowing that they have

13  somebody who is allegedly confessing to being high at

14  the time of a murder-- who was indeed high, to say

15  that's okay, we don't have to have a chemical test.

16       You know, if we went downstairs, or if we

17  went across the street to the Criminal Court and

18  someone was presenting a case to say that this man was

19  or was not under the influence, it would be thrown out

20  in the snap of a finger if the officer said, "We don't

21  bother with that.  Highway does that.  We didn't bother

22  doing that but the guy was drunk."

23       The Court would laugh you out.

24       But to say he was sober and to confess to a

25  murder, that's okay.  All you need is the opinion of an

b bs                    Proceedings              237

1    uninitiated -- yes, he has been to parties, he has

2    walked down the street, and he has made arrests when he

3    was a uniformed officer of people who are obviously are

4    falling down.

5         The question is not whether a person is

6    falling in the street.  This is a question of whether a

7    person can knowingly and voluntarily make a decision

8    about his Miranda rights, and knowingly and voluntarily

9    confess to a criminal act.  And when it came to the

10   highest crime in the State of New York, the police's

11   attitude was, "He looked okay to me."

12        That wouldn't fly in the Criminal Court on a

13   DWI.

14        Now, I suggest that that cavalier attitude

15   was carried further.

16        Where is your memobook?  I didn't write

17   anything down.  I know I didn't write anything down.  I

18   didn't bother writing anything down.  Even if I have a

19   memobook, I didn't write anything down.

20        Because the regulations, I asked Detective

21   Green, what are the regulations in reference to the

22   memobook?  You have to keep one.

23        But this officer knows absolutely for sure

24   that any memobook that he has, whether he looks for it

25   or not, won't have any notations in reference to his

b  bs                    Proceedings              238

1      activities. So that basically an officer in a blue

2      uniform couldn't get away with that cavalier attitude.

3           And yet in reference to a homicide case, "He

4      looked okay to me." "I didn't bother with a chemical

5      test even though I knew he was drunk." "I didn't

6      bother making notes in my memobook." "He voluntarily

7      confessed to me." And that's the basis that you are

8      being asked to make a determination. And it's a very

9      significant determination, because without this

10     evidence, Judge, this case will not -- cannot fly.

11          And it can't be cavalierly viewed as well,

12     the cops said that it's okay, therefore it must be

13     okay.

14          I suggest to your Honor that the law is that

15     the People have the obligation of justifying the

16     constitutionality of their offer, and there has been

17     nothing at all.

18          I'm not saying what they offered is weak.

19     I'm saying they didn't offer anything at all.

20          Now we have. The defendant took the stand.

21     The defendant said that he was high. And you know

22     what, Judge? His statement, his testimony is confirmed

23     by the police officer. He said he was high. He said

24     he was drunk.

25          The objective fact is he was taken out of a

b | bs                    Proceedings            239

1    bar, or sleeping in his car, or where ever it was, at 4

2    or 5 in the morning.  The bars I understand have to

3    close at 3.  So therefore the defendant, based on an

4    objective viewing of the defendant, was inebriated, or

5    under the influence of something, both by way of the

6    observation of the police officer, by way of the

7    testimony of the police officer, by way of the

8    defendant himself.

9          Now, under those circumstances the People

10   have to come forward and show that that wasn't the

11   case.

12         The People haven't come forward with one iota

13   of evidence, and that is not -- it isn't the defendant

14   who has to prove that he was drunk.  The People have to

15   prove that what they are offering was knowingly and

16   voluntarily made.

17         They haven't proven that at all.  Not even

18   have they made an attempt at it.  And so I suggest to

19   the Court that the Court cannot, just as the People

20   cannot rely upon the assumption of normal sobriety,

21   they can't do that because the officer -- the detective

22   doesn't know this defendant, never saw him before, and

23   doesn't know what his normal demeanor is or was.

24         Moreover in a situation where the defendant

25   looks drunk, acts drunk and is taken out of a bar at 5

b bs                    Proceedings              240

1      in the morning and confesses to a crime that was

2      allegedly committed, according to the statement that

3      was taken from him, when the defendant was taking

4      various drugs, it becomes more significant for the

5      People to come forward with evidence to justify that

6      indeed he did know.

7           Now, what argument are the People going to

8      give?  Only that Detective Bavolar said he looked okay

9      to me.  And that's not sufficient, Judge, particularly

10     in this day and age with the sophisticated equipment

11     that is available within a baseball throw of this

12     courthouse, and within a baseball throw of the 47th

13     Precinct to make that determination.

14           Blow into this tube.  Blow into this balloon.

15     And that the police department doesn't have that in

16     every precinct is shocking.  But let's assume they

17     don't.  They had it in Highway 1, and Highway 1 is

18     right over there on the Bronx River Parkway.

19           Their whole headquarters is there.  I am sure

20     at 4 or 5 in the morning it would take no more than

21     five minutes, not ten minutes, to get the equipment

22     over.

23           Know why they didn't, Judge?  Well, I'll take

24     a wild guess.  They didn't get the equipment because it

25     would have shown that the defendant was chemically,

b bs                    Proceedings                241

1   objectively, medically under the influence of drugs or

2   alcohol and they didn't want that.  It's as simple as

3   that.  They did not want the objective facts to be

4   shown.  And so they ignored it, and they have Detective

5   Bavolar get up and say he looked okay to me.

6          That's not the test.  That's not the test at

7   all.  The question he must be knowing and voluntary.

8          The law doesn't say that it appears that he

9   is knowing and voluntary.  It is that he must have

10  knowingly and voluntarily.

11         When you take a plea you would ask the fellow

12  if he has had any drugs or narcotics or under the

13  influence of anything prior to his allocution.  And if

14  he said --

15         THE COURT:  I usually don't do that.  I size

16  up the reaction of the defendant.

17         MR.IANNUZZI:  Well, I have been in courts

18  that have done it.

19         THE COURT:  I know some people do do it.

20         MR.IANNUZZI:  And it is done very often, and

21  if the fellow were to say to you, by the way, Judge,

22  while I look terrific, I have been drinking all night,

23  and I have been doing cocaine, I have been doing

24  P.C.P., I would think that the reasonable response

25  would be, I think we will take this tomorrow, because

b bs                    Proceedings                    242

1    we are not going to take one where you have the

2    possibility of somebody being under the influence.

3         And I suggest that they knew that he was.

4    And went out of their way not to have the objective

5    evidence.  Particularly when the facilities are at

6    hand.

7         And the statement does not speak for itself,

8    because we are not here to determine the content of the

9    statement.  We are here to determine whether or not the

10   statement was voluntarily made, whether the Miranda

11   rights were voluntarily waived, and that can only be

12   done by a knowing conscious waiver.  And knowing and

13   conscious means that the man is not impaired.  And

14   impaired, no matter how you look at it, could have been

15   readily determined by that equipment that has been

16   designed for police work to determine whether or not a

17   human being is under the influence, or has his

18   capacities diminished and impaired.  And they

19   specifically went out of their way not to do that

20   because they knew he was under the influence.

21        And I suggest to your Honor under

22   circumstances like that, there is an additional measure

23   that the police and the district attorney now have to

24   come forward and say we proved that in fact that at

25   that moment, and at that time he wasn't.  And I suggest




1    to your Honor that they haven't done anything to that

2    effect, nor can they.

3           And I would say that under those

4    circumstances, it can't be that this Court ignores that

5    information and says, well, -- and the only think you

6    can rely on is Bavolar saying he looked okay to me, and

7    looking okay and having an actual impairment are two

8    completely different things.

9           As such I believe that the statement --

10          First of all, the Miranda warnings were not

11    appropriately waived by this defendant because of his

12    incapacity at the time.  The statement, according to

13    both the physical reality and the defendant's statement

14    that in fact they were telling him because he doesn't

15    remember and didn't remember that they were telling him

16    and writing things down, and the very fact that he

17    didn't put anything on the paper except his signature,

18    he looks at the signature and says, well, it looks like

19    my signature, but frankly it isn't my normal signature.

20    But it looks like it.

21          There is not an initial on the page.  He

22    didn't write it out.

23          Judge, the police did everything in this

24    case, and the defendant says they put the words in my

25    mouth.  It therefore creates sufficient cloud requiring

b│bs                    Proceedings          244

1     the People to come forward with more than nothing.

2     They cannot rely upon the normal assumption of sobriety

3     and knowledge where in fact something has been raised

4     to show that that was not the case.

5            Thank you, sir.

6            THE COURT:  Thank you, Mr. Iannuzzi.

7            Mr. Smith?

8            MR. SMITH:  Your Honor, unless there is any

9     particular point that the Court wishes me to address,

10    I will rest on the record.

11           THE COURT:  I have no particular questions

12    for you, no.

13           Thank you.

14           MR. SMITH:  Fine.

15           THE COURT:  Thank you.

16           People?

17           MR. MC CARTHY:  Judge, I am comfortable with

18    the record here, but I just would like to suggest a

19    couple of things to your Honor.

20           One is that with respect to both defendants

21    and their written and oral statements, I believe it is

22    clear from the record that they were properly advised

23    of the so called Miranda warnings, and made knowing and

24    intelligent waivers with respect to Detective Bavolar

25    and, I guess, Green.

b bs                    Proceedings              245

1           We also had an opportunity yesterday

2    afternoon to view the videotaped statements, Judge.

3    And I think if it can be said that the truth of the

4    statement that seeing is believing was borne out in

5    this courtroom, that happened yesterday.

6           You recollect, I am sure, that the defendant

7    Stallings on the video not only affirmed his original

8    written statement, and his waivers, and his advisement

9    of the Miranda warnings, but actually spoke on the tape

10   to the effect that he had been treated fairly and

11   decently by the police, and he had been fed.

12          And you will recollect as well the defendant

13   Millington also affirmed both the Miranda warnings and

14   the statement to ADA Alaqua on that videotape.

15          With respect, of course, to the issues raised

16   by Mr. Iannuzzi, I think the essential judgment that

17   your Honor has to make is a credibility determination,

18   and, frankly, having heard his direct testimony, it was

19   one of those cases where you really wonder whether you

20   should cross examine him or not, since it is my

21   opinion, and I think the record supports the fact that

22   his testimony was essentially devoid of credibility, and

23   crafted to deal with the issues of this trial.

24          He certainly remembered what helps him and

25   couldn't recall what did not.

　
b | bs                    Proceedings                246

1    But perhaps most significant of all, having

2    had a chance to see the video, and having had a chance

3    to see him here in the courtroom, the first question I

4    asked him was not a facetious one. He looked better on

5    the video than he did in this courtroom being

6    questioned about this particular case. And under the

7    standard enunciated by this defendant, I think under

8    those circumstances we were probably all remiss in not

9    giving him a Breathalyzer test before he took the stand

10   here, because, you know, he looked better there than he

11   did here.

12   And you know what. I just don't think it

13   flies. I don't think the credibility judgment falls on

14   his behalf. I think it falls on behalf of the

15   Prosecution's case, and I ask the motion be denied in

16   it's entirety.

17   MR. IANNUZZI: May I have twenty seconds?

18   THE COURT: Thank you, Mr. McCarthy.

19   Yes.

20   MR. IANNUZZI: I think what the district

21   attorney has asked you is that he thinks that it falls

22   on the side of the Prosecution. But it isn't a

23   question of which side is fairer, which attorney is

24   better.

25   It really falls on what did the evidence

b bs                     Proceedings                 247

1     show, and there is no evidence on behalf of the People

2     as required by the Constitution of the United States

3     and the State of New York to bear out their burden of

4     showing the constitutionality of the statements having

5     been -- and I thank Mr. McCarthy for the word that I

6     didn't put -- I put "voluntarily" -- consciously and

7     voluntarily.

8              But there is another one.  Intelligently

9     made.  And there is no proof that that was done.

10             So it isn't a question that it is a good idea

11    for the prosecution to carry or use to carry.  The

12    question is what does the evidence show, and the

13    evidence that the People have put up does not support

14    their burden of showing constitutionality.

15             Thank you.

16                           next page

17

18

19

20

21

22

23

24

25

248

c dr

Decision

1          THE COURT:   Thank you Mr. Iannuzzi.

2          Anything further from anyone?

3          MR. McCARTHY:   No, sir.

4          MR. IANNUZZI:   No, sir.

5          THE COURT:   I'm going to take a

6    little time to consider your arguments and the

7    testimony at the hearing, and the physical

8    exhibits, and then I'll give you a decision

9    shortly.

10          You can take a break if you want,

11   about fifteen, twenty minutes.

12          (Whereupon there was a brief recess

13   in the proceedings.)

14          COURT CLERK:   Hearing continued, all

15   parties are present.

16          THE COURT:   This hearing was held to

17   determine the admissibility of certain

18   statements attributed to each defendant that

19   the People seek to offer at trial.

20          At this hearing, the People bear the

21   burden of establishing, beyond a reasonable

22   doubt, the voluntariness of any and all

23   statements so offered, and the knowing,

24   intelligent, and voluntary waiver of the

25   Constitutional rights commonly referred to as

c dr                    Decision

1    Miranda rights associated with the right to
2    remain silent and the right to counsel.
3             With regard to these issues, I heard
4    testimony from two detectives, two retired
5    detectives, Detective Thomas Bavolar and
6    Detective Maureen Green, both formerly of the
7    47 Precinct.  And I also heard testimony from
8    defendant Devon Millington.
9             The Court, at a hearing of this
10   nature, must make factual determinations,
11   factual findings, which requires an assessment
12   of credibility of witnesses.
13            I observed all the witnesses who
14   testified, and I have assessed their testimony
15   and the reasonableness of it, and I ascribe
16   credibility to Detective Bavolar and Detective
17   Green with regard to assertions made by Mr.
18   Millington, Devon Millington.  I reject his
19   assertions on the issues I must decide, and
20   find him not credible in that regard.
21            With regard to findings of fact and
22   conclusions of law, I find, essentially, the
23   following:
24            That at issue are five statements,
25   three made during questioning by the police and



c dr

Decision

1    two during questioning by an Assistant District

2    Attorney during a videotaped session.

3         Chronologically, from the credible

4    evidence, the Court has learned that on July

5    20th, of the year 2000, a homicide

6    investigation was initiated because the

7    bartender at a place known as Bill & Bob's Bar,

8    located in the Bronx, was shot to death and

9    money taken during a robbery, and a police

10   investigation began seeking patrons at that

11   particular establishment who might throw some

12   light on the perpetrators, or who the

13   perpetrators were.

14        On July 21st, which would be the day

15   after the crime was committed, Anthony

16   Stallings was interviewed by Detective Bavolar

17   at the 47th Precinct.  This, the Court finds,

18   was not a custodial situation.  Mr. Stallings

19   was not in custody, he was not under arrest, he

20   was free to leave, and although I don't recall

21   any specific testimony on the subject, I

22   believe he did leave after the interview,

23   having heard nothing to the contrary, and under

24   any test whatsoever would not have considered

25   himself in custody, under the circumstances in

c dr

Decision

1   existence, if innocent of the particular

2   crime.

3          As such, no Miranda warnings were

4   required, nor given, and the information

5   related to Detective Bavolar, in the form of an

6   admission, concern the events of that

7   particular night, July 20th, 2000, and is

8   reflected in a DD5 report completed by

9   Detective Bavolar and from which he refreshed

10  his recollection.

11         I find that those statements were

12  made pursuant to a normal police investigation

13  and were non custodial in nature, and were

14  voluntarily provided, and as such, the People

15  have met their burden of establishing the facts

16  just mentioned in the statement, and is

17  admissible at trial.

18         On October 6, Mr. Stallings was once

19  again at the 47th Precinct, but this time in

20  custody.  There is no issue on the fact that

21  any questioning that occurred on this date

22  involving defendant Stallings was custodial in

23  nature.

24         The Court finds that prior to any

25  custodial questioning he was advised of his

c dr                    Decision

1    rights pursuant to the Miranda decision, and

2    other cases that will require the rights to be

3    explained to a defendant, and that the

4    defendant knowingly and intelligently and

5    voluntarily waived his Fifth and Sixth

6    Amendment rights.

7              I find beyond a reasonable doubt that

8    the rights were administered.  In this case I

9    believe they were administered by Detective

10   Green, as testified to by Detective Bavolar,

11   again refreshing his recollection from

12   Detective Green's paperwork, and that the

13   statement given was a voluntary statement.

14             With regard to the next event, it

15   occurred on October 7th, in the form of a

16   videotaped interview between the defendant and

17   Assistant District Attorney Gatto.  It was a

18   custodial setting and I viewed the videotape

19   and listened to ADA Gatto administer the

20   Miranda warnings.

21             The defendant acknowledged the

22   warnings, understood them, and the Court finds,

23   beyond a reasonable doubt, knowingly,

24   intelligently, and voluntarily waived his Fifth

25   and Sixth Amendment rights, that any statement

253

c dr                    Decision

1       that follows is admissible at trial.

2                   The next person involved in the case

3       is defendant Devon Millington who was arrested

4       shortly thereafter, shortly after the

5       statements of Mr. Stallings, and that he was

6       involved in a custodial setting and questioning

7       conducted by Detective Bavolar who administered

8       Miranda warnings to Mr. Millington.

9                   I find that the warnings were the

10      legally sufficient warnings, that the defendant

11      acknowledged receiving them, and knowingly,

12      intelligently, and voluntarily waived his Fifth

13      and Sixth Amendment rights beyond a reasonable

14      doubt.

15                  The conversation and statement to

16      Detective Bavolar, as testified to by Detective

17      Bavolar that followed is, therefore, admissible

18      at trial.

19                  Thereafter, a videotaped interview

20      was conducted between Devon Millington and

21      Assistant District Attorney Alloqua.  This was

22      a custodial setting.  Miranda warnings were

23      required and they were administered by ADA

24      Alloqua.

25                  As the Court viewed on the videotape,

c dr                    Decision

1    they were proper in nature.  The defendant

2    acknowledged the warnings themselves, and

3    knowingly and intelligently and voluntarily,

4    the Court finds, waived his Fifth and Sixth

5    Amendment rights.  And that is established

6    beyond a reasonable doubt to the Court's

7    satisfaction, and the contents of the videotape

8    interview are therefore admissible at trial in

9    regard to Devon Millington.

10             So, in summary, the People have met

11   their burden of establishing, beyond a

12   reasonable doubt, the voluntariness of the

13   police statements offered in advance of trial.

14             People have satisfied, beyond a

15   reasonable doubt, that they are voluntary

16   statements, as required by the statute, and by

17   the case law.

18             As such, the motion to suppress any

19   and all such statements with regard to each

20   defendant must be denied, and each counsel for

21   each defendant has an exception to the Court's

22   ruling.

23             The foregoing constitutes the

24   decision and opinion and order of the Court.  A

25   short form order will be prepared and placed in

FORM FED. ® FENGAD · 1-800-521-9089

255

c dr                    Decision

1        the indictment file as an additional record of

2        the Court's findings.

3                All right.  Let's go on to

4        questioning and the question of severance.

5                You know, I've reviewed the

6        statements that were made, and it would seem to

7        me that what we have are what are commonly

8        referred to as interlocking statements by each

9        defendant.

10               Therefore, you know, certain options

11       are open and must be considered.  They're

12       essentially options that the People have to

13       consider.  One is severance, so that the

14       defendant being tried singularly would have a

15       statement that the People would seek to offer

16       in an unredacted form.

17               The other option is an attempt at

18       redaction, so that there is nothing in the

19       statement of one defendant to indicate or

20       suggest to a jury that he is making admissions

21       concerning a co-defendant.

22               There's a lot of case law on that,

23       and the use of pronouns, instead of names, or

24       just omitting certain words, et cetera.  I

25       think the law is pretty clear that redaction

FORM FED ® PENGAD·1-800-631-6989

256

c dr

Decision

1    has to be thorough and effective redaction, so

2    there is absolutely no suggestion or thought

3    that the statement of one defendant is somehow

4    implicating a co-defendant.

5            The last choice, I suppose,

6    hypothetically, at least for the People, is to

7    use no statements, and that would eliminate any

8    Bruton issue.

9            Have you given thought to the

10   situation?

11           MR. McCARTHY:   You left out choice

12   four, which was two juries, Judge.

13           THE COURT:   Choice four is two

14   juries, which is a choice I seek not to

15   employ.

16           MR. McCARTHY:   Judge, I actually

17   have given a lot of thought to this matter, and

18   I think, frankly, you have a sense of what the

19   case is about, and it rests in large measure

20   upon the statements of each defendant, and I

21   don't see a meaningful way to redact those

22   statements in such a fashion that there could

23   be a joint trial where I was not really

24   diluting the power of my proof.

25           I've already indicated to Mr.

257

c dr

Decision

1    Iannuzzi and Mr. Smith that, in my opinion,

2    assuming this was to be the Court's ruling,

3    that I think there would have to be a severance

4    of the trials, and frankly, that's the option

5    that I think the interest of justice is best

6    served by.

7         So, I'm going to consent to the

8    severance motion based on the ruling that the

9    Court has made, in my judgement, about the

10   facts and circumstances, and how best to

11   proceed with the case.

12        THE COURT:   Which case would you try

13   first?

14        MR. McCARTHY:   I've also indicated

15   to these gentlemen that I think the first trial

16   should be with respect to the defendant alleged

17   to be the shooter, which is Mr. Millington, and

18   that's the one I intend to proceed on.

19        THE COURT:   Then that's how we'll

20   proceed.   And Mr. Stallings's case will have to

21   be adjourned, but should follow Mr.

22   Millington's case, whatever the outcome of this

23   case.   Because that will, I think, really be

24   the best way of maintaining the availability of

25   all witnesses.

                                                           258
c dr                    Proceedings

1                       MR. SMITH:   That was my question.

2        Judge.  So, should I consider myself on trial?

3                       The only reason I'm asking, I have

4        judges in Queens that want me, and I don't know

5        what to tell them.

6                       THE COURT:   Well, I don't know, I

7        haven't really received a witness list, yet.  I

8        have some rough idea, in my own mind, how long

9        the trial might take, by my own evaluation of

10       what the People's case probably is with regard

11       to Mr. Millington.

12                      And I think what I can do is, I can

13       help you by simply having you consider yourself

14       ready and passed.

15                      MR. SMITH:   That's fine with me,

16       Judge.

17                      THE COURT:   To follow up this

18       trial.  But, I'll tell you, the problem is --

19       actually, it's not a problem.

20                      How many witnesses do you

21       anticipate?

22                      MR. McCARTHY:   I think,

23       realistically, there's somewhere between eight

24       and ten.  Most of them are relatively minor.  I

25       think this is maybe three and-a-half to four

c dr                    Proceedings

1      days worth of testimony, on my case, tops, and

2      then whatever Mr. Iannuzzi sees fit to do,

3      passed jury selection.

4              THE COURT:    I would probably tell

5      the perspective jurors, in any case, that at

6      the outside, the case should be completed on or

7      before January 25th.

8              Now, starting Tuesday of next week,

9      that's twelve trial days, and I think that's

10     sufficient.  And the case might be completed

11     earlier than that, but at the outside, I don't

12     think it should go longer than that.

13             Would that be a reasonable estimate,

14     do you think?

15             MR. IANNUZZI:    I think so, sir.

16             MR. McCARTHY:    Yes, I think that's a

17     generous one, and we should be finished within

18     that timeframe.

19             THE COURT:    So, what I would do

20     then, I put Mr. Stallings case on for -- I'll

21     be working a different part starting the 28th,

22     so I'll simply have it called in Part 20 on the

23     28th.

24             The question is, would you be ready

25     to go right in to that?

c dr                Proceedings

1                    MR. McCARTHY:   Barring any really

2       big complications with witnesses, I would think

3       it's simple enough to re-start the case, Judge.

4                    THE COURT:   Would it be better for

5       you, Mr. Smith, to take care of your other

6       commitments with a letter from me indicating

7       that you're expected to start on the 28th, of

8       January?

9                    MR. SMITH:   My commitment is

10      actually on the 25th.  It's adjourned to the

11      25th.  The case that was on trial today got

12      adjourned to the 25th.

13                   MR. McCARTHY:   Do you want to put it

14      on for the 22nd, and we can see where we're

15      at?  It's the first day back after the holiday,

16      if that's good for Mr. Smith.

17                   MR. SMITH:   I'll ask for the 23rd.

18      I'll be in the Bronx on that day.

19                   THE COURT:   Sure.  So you'll be

20      prepared, then, obviously, Mr. Smith, to make

21      other court commitments, other appearances

22      between now and the 23rd.

23                   MR. SMITH:   Yes, Judge, if there's a

24      problem, I'll contact you.

25                   THE COURT:   If you need a letter

261

c dr

Proceedings

1      from me saying you're expected to start on the

2      23rd, there's no problem getting you that

3      letter.

4                  MR. SMITH:    Thank you, Judge.

5                  THE COURT:    Okay.

6                  MR. SMITH:    Fine.

7                  THE COURT:    Even if you don't, it

8      will still protect you, to a certain extent.

9                  MR. SMITH:    I like the comfort of

10     the letter, Judge.

11                 THE COURT:    We'll prepare a letter

12     for you.

13                 MR. McCARTHY:    I'd be happy to sign

14     it, too, if that means anything.

15                 THE COURT:    I think then what we

16     ought to just deal with are some preliminary

17     matters before trial.

18                 And Mr. Stallings's case is adjourned

19     to January 23rd, and you can take his defendant

20     down.

21                 MR. SMITH:    Should I feel

22     comfortable in the fact that I will be provided

23     minutes of Mr. Millington's trial?

24                 THE COURT:    I approved you getting a

25     copy of the hearing.

262

c dr                     Proceedings

1                    MR. SMITH:   As well as Mr.

2        Millington's trial?

3                    THE COURT:   No.

4                    MR. SMITH:   No, Judge?

5                    THE COURT:   On what basis would I

6        provide you with minutes of the co-defendant?

7                    MR. SMITH:   To help.

8                    THE COURT:   To help you?  I'll look

9        in to it.

10                   MR. SMITH:   Thank you, Judge.

11                   THE COURT:   Right now the

12       application is denied, but I'll give it a

13       second thought to see what's appropriate.

14                   MR. SMITH:   Thanks, Judge.

15                   THE COURT:   Now, do you have a

16       witness list for me, People, and defense

17       counsel?  This list doesn't commit you in any

18       way, it provides the Court with a list of

19       names, not attributed to one side or the other,

20       that I can provide the prospective jurors, just

21       to make sure they don't know anyone.

22                   MR. McCARTHY:   I did it in a really

23       nice typed fashion, to provide one to the Court

24       and a copy for the Court Reporter.

25                   THE COURT:   Mr. Iannuzzi, any names

263

c dr                    Proceedings

1      other than those names on the People's list

2      that you think might come up during trial, or

3      witnesses you might call?  You don't even have

4      to tell me if it's a witness, just a name.

5                 MR. IANNUZZI:    The only thing that I

6      can think of, off the top of my head, is Mr.

7      Millington himself, perhaps.  But I'm not sure

8      about that, so I don't know that we should even

9      mention that.

10                THE COURT:    They'll know the name,

11     they'll hear the name of the defendant

12     mentioned.  So, that's not going to be a

13     surprise.

14                MR. IANNUZZI:    Whether they know him

15     or not, they will know that at the outset, so I

16     don't know that we have to mention him.

17                And I'm thinking of a medical expert

18     whose name I'm not quite sure of at the moment,

19     but I will have it for you before we begin the

20     picking of the jury.

21                THE COURT:    Okay.

22                MR. IANNUZZI:    The reason I don't

23     have his name is because I haven't spoken to

24     him.

25                THE COURT:    That's all right.

c dr

264

Proceedings

1        On Tuesday, we'll call for a panel,

2    that should be the first thing that we'll start

3    with.

4        When the panel arrives, typically,

5    just to let you know my procedure, I briefly

6    tell them why they're here, then they'll be

7    sworn as perspective jurors, and then what I

8    typically do is -- I don't tell them the nature

9    of the charges, I go over scheduling and

10   religious problems that might prevent someone

11   from being a juror, physical, health problems

12   that might prevent them, scheduling problems,

13   in an attempt to weed out from the panel of 62,

14   that they will send us, any people who

15   physically simply can't be here, or for other

16   reasons could not participate in a criminal

17   trial.

18       Typically, on religious grounds or

19   for some other reason, high blood pressure,

20   whatever, can't get involved in this.

21       We're generally left with a group of

22   prospective jurors who are then informed of the

23   nature of the charges, and further voir dire is

24   conducted by the Court with regard to the

25   ability of those perspective jurors to evaluate

c dr                    Proceedings

1    and decide the case, according to the evidence

2    at trial, and the law provided by the Court,

3    excluding any possible prejudice or biases or

4    feelings of anger, revenge, or even sympathy.

5              My voir dire takes quite a bit of

6    time.  So I think it's unlikely that you will

7    even voir dire the jurors until the afternoon.

8    Because it seems that invariably there are also

9    many jurors who reached the jury box who need

10   to approach the bench to discuss such things as

11   their prior victimization of a crime, or

12   relatives or friends or family members who have

13   been convicted of crimes.

14             And so, a lot of activity in that

15   regard will take place at the bench, out of the

16   hearing of the other jurors.

17             So what you have to discuss with your

18   client, Mr. Iannuzzi, is when the time comes

19   that jurors approach the bench to tell the

20   Court why that particular perspective juror

21   feels that he or she cannot be fair, for some

22   reason, if selected for this case, whether your

23   client wishes to be close enough to the bench

24   to hear what the juror has to say, and observe

25   the juror, or whether Mr. Millington will leave

c dr                     Proceedings

1        the matter solely to you, content to remain at

2        counsel table, in the event you want to consult

3        with him in that regard.

4                But he wouldn't be able to be close

5        to the bench to hear or see the juror.  If he

6        wants to exercise what we call his Antiomarchi

7        rights, I typically place him to my left, to

8        the side of the bench, which is about four feet

9        from the bench, and because he's incarcerated,

10       he would be flanked by whatever number of court

11       officers the sergeant determines is required.

12               So, you'd have to tell me if your

13       client wishes to exercise his Antiomarchi

14       rights or is he willing to waive them and

15       simply have you at the bench, with the DA, to

16       talk to any perspective juror who approaches

17       the bench with some problem about sitting on

18       the case, with the knowledge that if you wish,

19       you can leave the bench and discuss the

20       situation with your client and return to the

21       bench, as you see fit.

22               MR. IANNUZZI:   You want me to make

23       that option now, Judge?

24               THE COURT:   You can tell me Tuesday

25       morning.

267

c dr                    Proceedings

1           MR. IANNUZZI:   I understand

2      perfectly, in reference to that.

3           You know, the difficulty I have with

4      it, and I just make this objection for the

5      record, were the defendant not incarcerated, he

6      would be permitted to come forward and stand

7      there, and with the defendant incarcerated,

8      he's going to be standing there flanked by two

9      court officers, and we might as well put a flag

10     around him, or a sign around his neck, and the

11     whole purpose of what we're doing, we go out of

12     our way to make it seem he's not incarcerated

13     when he is incarcerated.

14           But the procedures, and I understand

15     the problems, but I don't appreciate, for the

16     defendant, being flanked by two court officers

17     while he's standing at the bench, because he'll

18     be followed by them, stood next to them, and it

19     becomes, therefore, obvious, and I don't think

20     that that alternative is fulfilling his rights,

21     because it deprives him, in another fashion, of

22     other rights.

23           And, as a result of that, I have to

24     consider it and I'd like to have the

25     opportunity to consider it over the weekend and

268

c dr                          Proceedings

1       tell you Tuesday morning how we're going to

2       handle that.

3                  THE COURT:   Okay.  Also, during my

4       voir dire, I do give the jurors a

5       questionnaire, and I'll give you a copy, each

6       side.

7                  The questionnaire deals with -- off

8       the record.

9                  (Whereupon, there was a discussion at

10      the bench, off the record.)

11                 THE COURT:   So the questionnaire is

12      not all I ask the jurors, but it's personal

13      information from the jurors, so you know

14      something about them personally, and each juror

15      is asked to respond to the questionnaire,

16      verbally.

17                 Do you wish me to, during my voir

18      dire, Mr. Iannuzzi, instruct the jurors with

19      regard to the right of the defendant not to

20      testify at trial, and that if he does not

21      testify, no inference can be drawn against him

22      by the jury?

23                 MR. IANNUZZI:   Yes, sir.

24                 THE COURT:   I'll give that

25      instruction, and you can follow up to make sure

269

c dr

Proceedings

1   that jurors understand the instruction, but

2   you're directed not to embellish the

3   instruction by offering reasons to the jury why

4   he might or might not testify.   It's simply a

5   rule that applies if he does not, but there

6   cannot be explanations offered, one way or the

7   other, as to why he might or might not.

8                 Is there any need for a Sandoval

9   hearing in this case, any prior bad acts,

10   People, acts of moral terpitude, crimes or

11   other impeachment material?

12                 MR. McCARTHY:   No, your Honor.

13                 THE COURT:   There's no need for a

14   Sandoval hearing.

15                 Sequestration is not involved.

16                 One other base I touched, typically,

17   is disposition, just so we know that the base

18   was touched.

19                 Is there any disposition that would

20   satisfy both the People and the defense with

21   regard to the outcome of this case, rather than

22   a trial?

23                 MR. IANNUZZI:   Well, there's one

24   that would satisfy the People and one that

25   would satisfy the defendant.

270

c dr                    Proceedings

1              THE COURT:   That's why I say and,

2       not or.   It has to be both.

3              MR. McCARTHY:   We've actually been

4       discussing that, Judge.   We sort of know where

5       the bottom line is and we're not there, so I

6       guess the answer is no.

7              MR. IANNUZZI:   I'm sure over the

8       weekend Mr. McCarthy will reconsider it and

9       we'll discuss it with your Honor on Tuesday

10      morning.

11             THE COURT:   You may, if you wish.

12      Right now I'll note there's none satisfactory

13      to both.

14             The only thing I can tell you about

15      voir dire, I put sixteen in the box and the way

16      it's done, there will be two seats at the far

17      right of the box, two extra chairs, so there

18      will be sixteen in the box.

19             We load and unload the box from the

20      audience so there are no jurors in the well, I

21      don't like them wandering around here, it's too

22      small a courtroom.

23             Seat number one, first seat, first

24      row, and then you'll end up with sixteen and

25      we'll voir dire, hopefully, sixteen at a time.

c dr                    Proceedings

1          Just generally, if you have any

2    questions about the voir dire and the scope of

3    your voir dire, you know, you can look at the

4    statute, 270, to see what it permits.

5          And just know that I don't allow

6    scenarios presented to the jury, I don't allow

7    hypothetical questions submitted to the jury,

8    don't try your case in hypothetical questions

9    or scenarios to the jury.

10          The purpose of the voir dire is to

11    make inquiry of the individual jurors to

12    determine his or her impartiality and ability

13    to be fair and impartial and objective.

14          So, questions that go outside that

15    will not be permitted.  There should be, people

16    should be referred to -- when I say people, I

17    mean witnesses or the defendant himself by full

18    name rather than first names.

19          So Mr. Millington is not to be

20    referred to as Devon.  He's to be referred to

21    as the defendant, or Devon Millington, or Mr.

22    Millington.  Or, in your case, Mr. Iannuzzi,

23    your client.

24          (Continued on the following page...)

25    24 c dr

272
Proceedings

1        THE COURT:  But not by first name

2    only.  That would apply to all witnesses who

3    are referred to.

4            I rely on your expertise and

5    experience to -- for any further limits on what

6    is a proper voir dire and what is not.

7            And if you have any questions about

8    matters that you typically like to ask about

9    and think that might create an issue, you know,

10   tell me about it.  I've had all sorts of things

11   asked in this courtroom that I don't permit.

12   I've had D.A.'s who tell the jurors that they

13   once were defense attorneys.  I've had the

14   opposite with defense attorneys telling jurors

15   that they were once D.A.'s.  I don't permit

16   that.

17           I don't permit reference to former

18   Army or Navy or Air Force or Marine involvement

19   if it applies to you.

20           If a juror, for instance, says I work

21   for AT&T, it's improper for anyone to say I

22   used to work for AT&T, any litigant to say I

23   used to work for AT&T and show ground or

24   anything like that.

25           There can't be any attempts to

273
Proceedings

1     achieve some degree of personal familiarity of

2     jurors or to suggest any such familiarity.

3          Don't suggest anything about a hung

4     jury.  Don't ask jurors if it's 11 to one and

5     you're the one, will you stick to your guns.  I

6     don't permit that.  But you can ask jurors, for

7     example, if they're prepared to make up their

8     own mind, even if their thoughts may be

9     different from those of another juror.  Are

10    they prepared to discuss such thoughts with

11    their fellow jurors and listen to what their

12    fellow jurors have to say, but no suggestion of

13    jurors being in a mistrial situation.

14         Just to give you an example of

15    what's -- what happened in the past:  Neither

16    side should attempt to tear up the indictment

17    in front of the jury or a copy of it in an

18    attempt to demonstrate that the indictment is

19    not evidence or important in any way.  That

20    happened once.  So general rule is no

21    demonstration during voir dires of any kind.

22         Any questions about voir dire?

23    Anything else right now?

24         MR. MC CARTHY:  Is it okay for me to

25    be funny, Judge?

274
Proceedings

1          THE COURT:  Generally -- you mean
2     intentionally?
3          MR. IANNUZZI:  Don't worry about
4     that, Judge.
5          THE COURT:  Use good judgment, that's
6     all I can say.
7          MR. IANNUZZI:  Judge, in reference to
8     having the 16 in the box, do you then go
9     through the entire panel or as you're going
10    along if there is somebody who should be
11    excused, do you fill the box up again?
12         THE COURT:  Typically what I'll do,
13    I'll excuse people on my own initiative if I
14    feel a juror has expressed an inability to meet
15    the statutory requirement of an impartial
16    juror.  And if I use people and seats become
17    empty in the box, I'll refill the seats, yes.
18    I try to keep 16 in the box by the time the
19    People and defense have to voir dire.
20         MR. IANNUZZI:  And then in making
21    determinations of -- or exercising
22    peremptories, once you exercise the peremptory
23    in reference to say a particular box, are those
24    people immuned from peremptory subsequently?
25         THE COURT:  Yes.  The ones that are

275
Proceedings

1   left, yes.  Yes, but typically they'll be sworn

2   and excused.

3              MR. IANNUZZI:  How many peremptories

4   am I --

5              THE COURT:  20.

6              MR. IANNUZZI:  20.

7              THE COURT:  But as I often say to

8   both sides, the juror of your dreams is not

9   just around the corner.  And if -- even if the

10  juror were around the corner, you can be sure

11  the other side would probably --

12             MR. IANNUZZI:  Get rid of him.

13             THE COURT:  Exercise something.  So

14  try to use your best judgment in jury selection

15  with whatever panel we were sent, because it

16  will be, I assure you, a cross section of the

17  Bronx community.

18             When jurors approach the bench, by

19  the way, what I typically do is I'll hear what

20  the juror has to say, I'll ask any questions

21  that I have and then I'll ask the People if

22  they have any questions and I'll ask the

23  defense if you have any questions of the

24  juror.

25             You should not express an opinion one

276
Proceedings

1  way or the other in the presence of the juror
2  as to whether you wish to retain the juror,
3  excuse the juror.  I will send the juror back
4  to the audience if it's that stage of the
5  proceedings, and at that time I'll make inquiry
6  of you whether you consent or don't consent to
7  excuse the juror.  Or on occasion I'll simply
8  excuse the juror on my own initiative and the
9  same with jurors who might come from the jury
10  box to the bench.

11          No juror should hear one side or the
12  other express favor or disfavor toward that
13  particular person.  The jury, you know, I think
14  then is protected and you're protected from any
15  personal feelings one way or the other.

16          Okay.  Anything else?  If you have
17  any questions, you can broach them Tuesday
18  morning while we're waiting for the panel to
19  get here.  And before you ever exercise
20  challenges I'll go over the challenging
21  procedure; okay.  So, hopefully,
22  optimistically, if we have a jury by the end of
23  the day Wednesday, I'll be quite happy.  If we
24  have a jury after that, fine.  I just think --
25  I tell the jurors everyone is pledged to work

277
Proceedings

1     as expeditiously as possible to complete the

2     trial, that's what they expect.

3          MR. IANNUZZI:  One further thing.

4     When the jurors are excused, are they excused

5     en masse without an indication by whom, by

6     which side?

7          THE COURT:  Yes.

8          MR. IANNUZZI:  Just said "excused".

9          THE COURT:  The jurors would not know

10    who challenged the juror unless they sense it

11    from me when I excuse them.  What I do is

12    typically I just direct them to, you know, what

13    they learn when they got their jury coaching

14    downstairs -- not jury coaching, but what do

15    they call it --

16          MR. MC CARTHY:  Indoctrination.

17          THE COURT:  Right, when they receive

18    their indoctrination, they're given an

19    explanation how jurors are excused or

20    challenged.  That's the information they carry

21    with them.  They wouldn't know which side it is

22    when they're excused.

23          Also if there are any spectators at

24    the trial, either people associated with the

25    deceased or with the defendant, the rule is

278
Proceedings

1    that they're not to -- of course, and they must

2    be instructed by each side, by the attorneys

3    for each side -- they're not to even attempt to

4    make any contact with any jurors, to talk to

5    any jurors or even to speak loudly enough in

6    the presence of jurors, either in the street or

7    in the building so that a juror could hear what

8    is said, because I give the jurors very careful

9    instructions about reporting any such incidents

10   to the Court, so it's better to start out with

11   spectators knowing that.

12          And when the jury is excused, for

13   example, for lunch, during the trial, all

14   spectators must wait in the courtroom at least

15   two or three minutes before they leave the

16   courtroom so that they minimize chances of

17   interaction with any jurors.

18          Okay.  Anything else right now?

19          MR. IANNUZZI:  No, sir.

20          MR. MC CARTHY:  No, sir.

21          THE COURT:  Have a good weekend

22   everyone and we'll start Tuesday morning.  If

23   you're here promptly by ten that would be fine.

24          MR. IANNUZZI:  Thank you, sir.

25          MR. MC CARTHY:  Thank you, Judge.

279

Proceedings

1               *       *       *       *

2                  Certified to be a true and accurate

3    transcript of the stenographic minutes taken

4    within.

5                      Susan McPartland

6

7                   Susan McPartland
                    Senior Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Millington-Defense-Cross          970

1      Q.   Okay, what else would be required for you to
2    shoot a bartender?
3      A.   Nothing, because I don't believe I would
4    shoot a bartender.
5      Q.   How sure are you that you were at NYU and
6    then bought PCP the day of the homicide?
7      A.   I was a hundred percent sure.
8      Q.   Did you work all five days that week?
9      A.   Did I work?  When are you talking about July
10   20th?
11     Q.   The week of July 20th, I guess, Thursday
12   morning?
13     A.   No.  I think I took off the next day.
14     Q.   After the murder?
15     A.   Yeah.
16     Q.   And what about that, like that Monday and
17   Tuesday, did you work those days?
18     A.   Yeah.  I worked regularly after that.  Yes.
19     Q.   Now, are you just assuming that or do you
20   really actually remember this?
21     A.   Actually, to my recollection I think I
22   worked.  Of course I worked.
23     Q.   You said that you would go to ----
24          What's the name of the company that you work for?
25     A.   Remco.

Millington-Defense-Cross            971

1       Q.   You would go to Remco and then they would
2   send you out to where you were going?
3                MR. IANNUZZI:   Objection, Judge, already
4       asked and answered.
5       A.   What was that?
6       Q.   You would go to Remco, they would assign you
7   out to where you were going and then you would go to
8   wherever the job site was with your foreman?
9       A.   Yes.
10      Q.   And when they would assign you out everyday
11  of the week they would fill out a sheet, a work order
12  with who was going where, correct?
13      A.   Correct.
14      Q.   And they would put the foreman and the
15  helper, and the initials of the people assigned to
16  those jobs, correct?
17      A.   Correct.
18      Q.   And then that same sheet would let you know
19  whether you took a vacation day or something like that,
20  correct?
21      A.   I wouldn't know.
22      Q.   You do know about the job assignment part of
23  it, right?
24      A.   Yeah.
25      Q.   Okay.  So if I showed you those sheets from

Millington-Defense-Cross          972

1    that week would it help you refresh your recollection
2    as to what days you worked and didn't work?
3                MR. IANNUZZI:  Objection, Judge, this is
4         irrelevant at this point.
5                THE COURT:  Overruled.
6                MR. McCARTHY:   Judge, I have five days
7         I would ask that we mark them People's 25 for
8         identification.
9                MR. IANNUZZI:  May I see what the
10        district attorney has?
11               THE COURT:   First it will be marked,
12        just mark it People's 26A, B, C, D and E for
13        identification.
14           And then after it is marked show it to
15        defense counsel.
16           (Whereupon, the documents are received
17        and marked as People's Exhibits 26A, 26B, 26C,
18        26D, and 26E for identification.)
19               THE COURT:  The exhibit is handed to
20        counsel.
21           (Whereupon, the exhibit is handed to Mr.
22        Iannuzzi.)
23               MR. IANNUZZI:  May I have a moment with
24        the assistant?
25               THE COURT:   Yes.

Millington-Defense-Cross          973

1          ( Short pause.)

2                    THE COURT:  The Exhibit has been marked

3          for identification and has been shown to defense

4          counsel.

5                    MR. McCARTHY:  Could we show that to the

6          defendant.

7                    (Whereupon, the exhibit is handed to the

8          witness.)

9                    THE COURT:  Document is handed to the

10         witness.

11         A.    What does this prove?

12                   MR. McCARTHY:  I have some questions,

13              Judge.

14                   THE COURT:  You may continue.

15         Q.    All right.  Now, Mr. Millington, you said

16         before that when you get assigned out to a job--

17         A.    Uh huh.

18         Q.    --people fill in like the work address

19         and who goes where, right?

20         A.    Yes.

21         Q.    And those five pages that are marked

22         for identification are work records from Remco for

23         the  week of July 17th through the 21st, aren't

24         they?

25         A.    Where does it indicate that?

Millington-Defense-Cross          974

1          Q.   I didn't hear you?

2          A.   Where does it indicate that?

3          Q.   I'm asking you if you know from looking at

4     them, because you have been working there five and a

5     half years, correct?

6          A.   I don't handle none of the paperwork.

7          Q.   That would be handled by who?

8          A.   That would be handled by probably the

9     foreman.

10         Q.   Or maybe a man name Mr. Kenny, right?

11         A.   Yes.

12         Q.   Who is Mr. Kenny?

13         A.   Mr. Kenny is the manager of Remco.

14         Q.   And he keeps copies of those records,

15    right?

16         A.   Yeah.

17         Q.   Correct?

18         A.   Correct.

19         Q.   Well, for instance,  would it refresh your

20    recollection looking at those records that on Monday,

21    July 17th, you didn't go to work at all; does that

22    refresh your recollection?

23         A.   I don't know if I went to work on that

24    day.  Didn't I just tell you that?

25         Q.   I'm asking you if you could look at the

Millington-Defense-Cross          975

1   record and tell us if that refreshes your recollection

2   as to whether you went to work?

3        A.   I don't know if I went to work or not.

4        Q.   Well, did you call in sick maybe?

5        A.   Maybe.

6        Q.   How about Tuesday, did you go to work on

7   Tuesday?

8        A.   I don't know.

9             THE COURT:   That would be July 18th you

10      are talking about?

11            MR. McCARTHY:   That would be the 18th,

12      yes.

13            THE COURT:   Okay.

14      A.   Most likely.  I don't know.

15            MR. IANNUZZI:   Your Honor, would you ask

16      the witness to speak loudly so that the jury can

17      hear him.

18            THE COURT:   Keep your voice up.

19            Did you get the answer?

20      (Whereupon, the answer is read back.)

21      Q.   Well, you are on vacation, you took a

22   vacation day on the 18th, correct?

23      A.   I have, I got a lot of vacation days.

24      Q.   I'm asking you if you took a vacation day on

25   the 18th?

Millington-Defense-Cross          976

1        A.   How am I suppose to remember?

2                   MR. IANNUZZI:  Your Honor, it is not

3        necessary for either the district attorney or the

4        witness to yell at each other.

5                   THE COURT:  I don't know if I call it

6        yelling.

7                   MR. IANNUZZI:  Loud.

8                   THE COURT:    But the question was

9        asked and an answer was given.

10                  We will continue.

11       Q.   You didn't work at NYU on the 19th, did you?

12       A.   Yes, I did.  I worked at NYU around the

13       section, I am telling you NYU because everyone knows

14       NYU.

15       Q.   Right.  But that's not where you worked on

16       the 19th; you worked at 1 Hanson Place in Brooklyn, New

17       York?

18       A.   I did not work at Brooklyn, New York.

19       Q.   Flatbush Avenue Extension?

20       A.   No, I did not.

21       Q.   HSBC Bank?

22       A.   No, I did not.

23       Q.   You know that big building down town

24       Brooklyn?

25       A.   I did not work there.

Millington-Defense-Cross        977

1       Q.   You never worked there before?

2       A.   I worked there before.

3       Q.   So you know the one I'm talking about?

4       A.   I know the one you are talking about.

5       Q.   So, now on the next day, the 20th, are you

6   as sure that you didn't work at HSBC on the 19th as

7   you are that you didn't shoot the bartender?

8       A.   I didn't work there.

9       Q.   You said the 20th you stayed home?

10      A.   The 20th I stayed home.

11      Q.   Is that right?

12      A.   It's a possibility.  I could have stayed

13  home.

14      Q.   Well, are you changing your mind now?

15      A.   I never gave you a sure answer.

16      Q.   I guess we can all agree on that.

17              MR. IANNUZZI:  Objection to the

18      colloquy, and ask it be stricken.

19              THE COURT:  Sustained.

20      The jury will disregard that extra comment by

21      the district attorney.

22              MR. McCARTHY:  I ask you to direct the

23      witness to answer questions put to him and not

24      interject comments.

25              THE COURT:  No one is to interject

Millington-Defense-Cross          978

1        comments.

2            Q.   You went back to work on the 20th, didn't

3     you?

4            A.   May have.  Yes.

5            Q.   Back at HSBC, 1 Hanson Place, Brooklyn, New

6     York?

7            A.   Maybe.

8            Q.   Isn't that true?

9            A.   Maybe.  Maybe I worked there.  I'm a floater,

10    I go anywhere.

11           Q.   Well, now, you might have worked in Brooklyn

12    on Thursday but you definitely didn't work in Brooklyn

13    on Wednesday?

14           A.   I don't know.  You are telling me to

15    recollect from where I went from that time; and I told

16    you and that's that.

17           Q.   You don't seem to have any trouble telling me

18    not to put words in your mouth, do you?

19           A.   You're putting word in my mouth now.

20                   MR. IANNUZZI:  Objection, Judge, that

21           was not said by the witness.

22                   THE COURT:  He's being asked the

23           question.

24                   Question is:  Do you have trouble telling

25           people not to put words in your mouth?

Millington-Defense-Cross          979

1              THE WITNESS:   What was that?

2              THE COURT:   You can have it read back

3        or you can repeat it again, counsel.

4        Q.    You don't have any trouble telling me not to

5   put words in your mouth, do you?

6        A.    What was that?

7        Q.    Did you work at NYU on Wednesday or do you

8   not remember?

9        A.    I remember being in the section of  NYU.

10       Q.    You don't know where you were on Thursday, do

11  you?

12       A.    This paper doesn't mean nothing.  Because

13  any person, any helper or apprentice can be switched

14  off.

15       Q.    But your initials are DM, aren't they?

16       A.    Yes, they are.

17       Q.    Are you saying now that you recognize what

18  that paper is?

19       A.    I don't handle these papers.

20       Q.    Have you ever seen one before?

21       A.    I've seen a work order sheet before but I

22  never seen it like this.

23       Q.    Do you have the statement up there?

24       A.    Yes.

25              THE COURT:   Yes, the exhibit is there.

Millington-Defense-Cross          980

1        (Statement handed to Mr. McCarthy.)

2            MR. McCARTHY:  I'm going to display

3      People's 23 to the jury, Judge.

4      Q.   Just take a look behind you, do you see that?

5    Is that your signature?

6      A.   Yes, it is.

7      Q.   You remember a couple of weeks ago in this

8    courtroom you said that you didn't think that was your

9    signature?

10     A.   I said it is not like mine because you can

11   tell I was nervous.  It is my signature.

12     Q.   A couple of weeks ago didn't you tell Judge

13   Straus at a hearing here that didn't look like your

14   signature?

15            MR. IANNUZZI:  Objection, Your Honor,

16       this is inappropriate use of alleged prior

17       inconsistent statement if there be such.

18            THE COURT:  Well, you can make the

19       inquiry but if it's reflected in a specific

20       question followed by a particular answer

21       that's the way it has to be.  That's the way

22       the reference has to be made as oppose to a

23       summary.

24            MR. McCARTHY:  I just wanted to ask

25       the general question and then go to the specifics.

Millington-Defense-Cross          981

1   I will follow up in a minute.

2        Q.   Are you saying now that's your signature?

3        A.   That's my signature.  Yes, it is.

4        Q.   Now this statement here, and I'm holding up

5   People's  24?

6        A.   Yes, sir.

7        Q.   This is all what Bavolar told you and wrote

8   down for you, correct?

9        A.   No, that's partly what Garcia told me and

10  Bavolar told me.  And Bavolar was writing it out and

11  parts he was telling me to do this, and you know.

12       Q.   The question is, none of this came from you;

13  is that your testimony?

14       A.   Probably the angle dust part.  And he wanted

15  me to say that I shot him so I guess I said it; I

16  popped him.

17       Q.   So you did say that you popped him?

18       A.   Yes.  In cooperation, not cooperation, but

19  just being told what to say.  And he said  he will

20  help me.

21       Q.   Remember yesterday when we played that video

22  statement in the courtroom of you talking to the

23  assistant district attorney?

24       A.   Yes, sir.

25       Q.   That was you, right?

Millington-Defense-Cross          982

1    A.   Yes, sir.

2    Q.   And that was you reading through this

3 statement on TV, right?

4    A.   No, I wasn't reading  it on TV.  I was

5 reading.  It was read to me quite a few times.  I have

6 an understanding of it and that's what was told to me

7 to be said.

8    Q.   So it got read to you a couple of times and

9 you were able to like memorize it?

10    A.   Well, after Garcia comes in and tells me and

11 after he comes in and tells me, what am I suppose to

12 do?

13    Q.   Okay, let's go back to that signature for a

14 minute.  And reading from page two-0-five of the

15 transcript, page two-0-five line 16.

16         "QUESTION:  How about the signature where

17    it says Devon Middleton?.

18         ANSWER:  I really don't write like this

19    honestly.  I really don't write like this but I

20    mean it's almost similar.

21         QUESTION:  It is similar to your

22    signature?

23         ANSWER:  Almost.  Almost".

24    Remember being asked those questions and giving

25 those answers?

Millington-Defense-Cross          983

1     A.    That's my signature.

2            MR. IANNUZZI:  Objection, Your Honor.

3     This is not inconsistent.

4            THE COURT:  Overruled.

5            Once again the jury makes a

6     determination on an earlier statement as oppose to

7     trial testimony.  You decide if there's a

8     difference.  If that difference seems significant

9     to you, if the difference is significant you may

10    consider that difference as a factor in accessing

11    the credibility of the witness.  That's the use

12    that may be made of what is commonly referred to

13    as a prior inconsistent statement.  But you, the

14    jury, decide the facts of that matter.

15    Q.    Now, I'm putting up a portion of People's 24,

16    and at the top it says "Devon S. Millington", you see

17    that?

18    A.    Yes.

19    Q.    And that's what Bavolar  wrote down,

20    correct?

21    A.    Yes.

22    Q.    Because it's his handwriting?

23    A.    Yes.

24    Q.    What is your middle name?

25    A.    Stewart.

Millington-Defense-Cross          984

1      Q.   So, did Bavolar tell you your middle initial
2   was "S" or you told him?
3      A.   No, it's on my driver's license.
4      Q.   How about your address, {1334} Bussing
5   Avenue?
6      A.   That's on my driver's license also.
7      Q.   Did you tell him that's where you lived?
8      A.   You can actually go there and look at it.
9      Q.   I'm asking you if you told him that that was
10   your name, address and phone number?
11      A.   I don't know.  How am I suppose to remember
12   every single last detail?
13      Q.   You said you were able to remember every
14   single detail to recite it on the video.
15      A.   That thing was read to me and that thing is
16   not, it's not the same as the statement; you know
17   that?
18      Q.   Your phone number is not on your driver's
19   license?
20      A.   Of course, I know my phone number.
21      Q.   I'm saying Bavolar didn't know your phone
22   number, did he?
23      A.   Of course, they called my house.
24      Q.   How did he get your phone number?
25      A.   They called my house and told me I was

1  incarcerated, I was arrested.

2       Q.   What are you talking about?

3       A.   What are you talking about?

4            THE COURT:  Sustained as to form.

5            You have to ask a different question.

6       Q.   How did Bavolar get your phone number?

7       A.   I told him my phone number and he wrote it

8  down of course.

9       Q.   So that's part of the information you told

10  Bavolar?

11      A.   Yes, of course why not.

12      Q.   Now, the first thing that Bavolar wrote here

13  is that you said, "I already had smoked angle dust

14  before I got there"?

15      A.   Yes, sir.

16            MR. IANNUZZI:    Your Honor, the

17       document which is in evidence always speaks for

18       itself.   If the district attorney wants to ask

19       questions about the underlying factors that lead

20       up to the making of that, but not to read it to

21       the witness and ask him about it is improper.  It

22       speaks for itself.

23            THE COURT:  It speaks for itself.

24       It does speak for itself in terms of its

25       contents  but its contents may be inquired about

Millington-Defense-Cross          986

1        as proper cross-examination.  So the objection

2        must be overruled.

3        Q.   How did Bavolar know that you had smoked

4    angle dust?

5        A.   Because I was telling him constantly.

6        Q.   So, that's something that you told Bavolar

7    and he wrote down, correct?

8        A.   That could be one of the things.

9        Q.   Well, that is the one I'm asking you about

10   now.

11       A.   Angel dust, yes.

12       Q.   He didn't tell you:  Listen, say you smoked

13   angle dust, correct?

14       A.   No.

15       Q.   You told him I smoked angel dust?

16       A.   Yes.

17       Q.   And he wrote it down the first thing,

18   correct?

19       A.   (Affirmative nod.)

20       Q.   You have to answer?

21       A.   Yeah.

22       Q.   And then you said, "My friends Ray, his

23   brother Mike and Tony were already there, I had

24   alcoholic drinks and did cocaine", correct?

25       A.   Right.

Millington-Defense-Cross          987

1      Q.   Now, did you tell Bavolar that or did he tell
2   you?
3      A.   He told me the whole setting of everything,
4   but I knew that they was there.   Yes.
5      Q.   How did he know you were doing cocaine and
6   drinking?
7      A.   I told him I was sniffing cocaine, I was
8   high on angel dust and I was drinking.   And that's all
9   I explained to Bavolar for about a half hour, so of
10  course why wouldn't he write that down.
11     Q.   Well, then he did write it down, right?
12     A.   Yes, he wrote that down.
13     Q.   So what you are saying is some of the stuff
14  he wrote down, in fact, you had told him, true?
15     A.   Some of the facts, true.   Yeah.
16     Q.   And what he wrote down about the angle dust
17  and the alcohol and the cocaine, that kind of helps you
18  out, right?
19     A.   He said I will help you out if you help me
20  out.
21     Q.   One of the things you told him too is, "I was
22  numbed up and I was scared to death"; remember telling
23  him that?
24     A.   No.
25     Q.   You know when you were talking about using

1     based on the papers that they've sent forward.  And

2     a copy is provided defense counsel.

3              MR. IANNUZZI:  Do you want me to be

4     heard on that, Judge?

5              THE COURT:  Well, I'll hear you.  See, I

6     already issued the subpoena.

7              MR. IANNUZZI:  I know.

8              THE COURT:  So, the question is and the

9     case that they attach, which is a First Department

10    case, is a case where a judge in Manhattan issued a

11    subpoena, denied the Police Department motion to

12    quash.  The case went up.  Police Department took

13    it up.  The Appellate Division reversed the trial

14    judge and quashed the subpoena, pretty much on the

15    grounds that I mentioned, and under the Litto case,

16    in that there was insufficient factual basis to

17    issue the subpoena.  So, I suppose what they're

18    saying to me, the Police Department is, yes, you

19    issued the subpoena but why and what for?  Why does

20    the counsel need the Police Department regulations

21    concerning whether detectives have to keep memo

22    books.  That just seems to be a fishing expedition.

23    And what does it have to do with the guilt or

24    non-guilt of the defendant or any other material

25    issue at trial?

of f                    Proceedings

1          Your argument would probably be that at

2     the hearing, the detectives testified that they

3     didn't have their memo books. They hadn't been

4     able to locate them and they weren't quite sure,

5     they didn't think they had to keep memo books, as

6     detectives, that it really wasn't necessary to do

7     it.  I wasn't sure -- I'm not sure of their exact

8     testimony in that regard.

9          So, basically, you want it for

10    impeachment purposes, if they testify at trial, I

11    would imagine.

12          So, the question is should the subpoena,

13    based on the law and memorandum submitted by the

14    Police Department, should I insist on compliance by

15    the Police Department or should I take, you know,

16    accept the Memorandum of Law and the cases they

17    pass on in their argument as being a proper

18    approach and decide to -- that the subpoena was

19    improvidently issued.  I guess that's really what

20    the issue is.

21          MR. IANNUZZI:  Well, it's amazing that I

22    thought I was in the Supreme Court and I thought

23    that you were a Justice of the Supreme Court and

24    that when you gave an order to the Police

25    Department, that they had to comply and that you're

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1      not here with a knee jerk reaction to defense

2      counsel, just signing anything willy-nilly, but I

3      guess they don't think that.

4                THE COURT:  No, no, they have a right to

5      move to quash, as the case that they submitted,

6      where a Supreme Court justice in Manhattan issued a

7      subpoena.  The Police Department moved to quash,

8      just as they're doing here.  That court denied the

9      motion to quash and on appeal of that decision, of

10     that denial, the Appellate Division First

11     Department, it's towards the end of their papers,

12     explained why the motion to quash was granted

13     should have been granted, and overruled the Supreme

14     Court.

15                MR. IANNUZZI:  I have read this.

16                THE COURT:  And I'm a -- you know, I'm

17     bound to follow the reasoning and holdings of the

18     First Department, as you know.  And sometimes

19     subpoenas are issued and then there's a motion to

20     quash.  Sometimes the defense moves to quash the

21     People's subpoena and the Court has to consider the

22     arguments made and decide whether or not the

23     subpoena was issued improperly or without due

24     justification.

25                MR. IANNUZZI:  Well, Judge, but you, I'm

pf f                     Proceedings

1       sure, recognize the distinction between the -- I

2       guess this is the Litto case. I'm not sure, Bagley

3       case.

4               You recognize the distinction in the

5       Bagley case. The Appellate Division affirmed or

6       actually quashed and overruled the quashing. No,

7       overruled the failure of the trial part to quash

8       and quashed and granted the motion, because they

9       said the court erroneously denied the Police

10      Department's motion to quash, since the defendant

11      failed to put forth a factual predicate.

12              But I have put forth a factual predicate

13      that -- which I didn't put it in the subpoena,

14      where it's not intended, because I didn't make a

15      motion for the subpoena. I handed you the

16      subpoena. You questioned it and struck out half or

17      three quarters of the subpoena and took evidence in

18      reference to or at least took a proffer in

19      connection with it, got the basic underlying

20      predicate to support the contention that the

21      document sought bears relevant and exculpatory

22      evidence and made a determination, as a sitting

23      justice, that the Police Department and Mr. Bagley,

24      or Mr. Bogan, Jeffrey Bogan, who is an attorney,

25      decided that you didn't exercise your discretion

pf f                    Proceedings

1        properly is nonsense, because this is not the same,

2        we are not in pari delicto with the Bagley case,

3        because we do have a predicate and your Honor

4        reviewed it.   That you have to explain to the

5        Police Department on a subpoena why you did that,

6        or if, at this point, to explain to the -- to

7        Mr. Bogan, that, in fact, you took the factual

8        predicate and it's on the record, perhaps the

9        Police Department would be so kind as to relent

10       from the position that they take defying your

11       Honor's so order.

12                       I know that they're entitled to do that,

13       but now that we have found out that they're wrong,

14       perhaps we can go forward and if you will, I will

15       put in an answering paper saying that you have the

16       factual predicate, but I don't think that should be

17       necessary, because here we are on trial and what

18       they have done and what they intend to do and what

19       they want to do is continue the trial by ambush

20       that has been permitted so often and that Copicotto

21       from the Court of Appeals said, a trial shouldn't

22       be -- and you know, Judge, if I had just come in

23       and sandbagged you, that's one thing.   You had a

24       discussion about this.   You eviscerated my

25       subpoena.   You -- I went along with it over

pf f          Proceedings

1       objection. And you made a decision and now they

2       want to eviscerate it further, saying you didn't

3       know what you were doing.

4                  THE COURT: Well, someone could probably

5       trot down there to police headquarters and see if

6       there's a patrol guide or detective regulation

7       guide that covers the subject and that would

8       probably be it.

9                  MR. IANNUZZI: Who would show it to us?

10                 THE COURT: In my own mind, I'll study

11      the papers and study the issue. I issued the

12      subpoena for that little bit of rules and

13      regulations, not with the idea that -- not

14      necessarily that they could be used at trial, but I

15      thought it had some relevancy to your questioning

16      during the pretrial hearings. So that's why I

17      narrowed the subpoena to that.

18                 But I guess, I guess the question is,

19      for me, is, you know, what do I -- do I adhere to

20      their arguments or not? So I'll study their papers

21      and give a decision. I don't know if they're

22      saying that you should have proceeded otherwise

23      under C.P.L.R. and move for the subpoena on Notice

24      of Motion, so that the district attorney could

25      oppose or not oppose the issuance of it and offer

1       reasons.

2               Therefore, I'll have to look at it more

3       closely, to see if that's the reason that they're

4       attacking it in whole or in part.

5               MR. IANNUZZI:  By the way, Judge, just

6       as an aside, which isn't really an aside, the

7       district attorney was here to oppose or not oppose.

8       They don't know that perhaps, they, meaning the

9       Police Department don't know that, but the district

10      attorney, two district attorneys eminent district

11      attorneys and counsel were here when we went

12      through this entire thing.  Maybe there's a way

13      that you have to put on a subpoena all of the steps

14      that were taken, but I don't think so.

15              And I'd just like to note for the

16      record, which is very interesting, the district

17      attorney's suggestion that I can't have discovery

18      of the files and everything and suddenly the Police

19      Department, in this position, takes a position that

20      I took, that the Police Department is not an arm of

21      the District Attorney's Office but they are an

22      investigative office and if we don't have, we the

23      public and attorneys, don't have access to their

24      investigative reports, then they disappear and

25      nobody has them, because you can't have a private

of f                    Proceedings

1          investigator with the Crime Scene Unit

2          investigating, so that they basically are quasi

3          public and they agree with that.  They say we're

4          not an arm of the district attorney.  We're a

5          private party.

6              Well, if they're a private party, no

7          private party has a right to maintain an

8          independent position and obstruct the functioning

9          of this Court.

10              THE COURT:  Okay.  I'll take their

11          papers under advisement.

12              MR. IANNUZZI:  Yes, sir.

13              THE COURT:  Okay.  Now, tomorrow, we

14          should have a full day.  The time factor is

15          disturbing to me.  I wanted to start -- I want the

16          attorneys in court by ten and you didn't -- you

17          weren't here, Mr. Iannuzzi, until after that.  It

18          may have been traffic.  I don't know what.

19              But I don't want the jury to be told to

20          be here by 9:45 and then I don't bring them up to

21          the courtroom until much later and they just decide

22          that, you know, that we're just dragging time.  So

23          I want everyone here to start by 10 o'clock.

24              MR. IANNUZZI:  Yes, sir.

25              THE COURT:  If you're not here by 10

pf f            Proceedings

1     o'clock, I'm going to ask for a reason.  If the

2     reason is unsatisfactory, either side is subject to

3     sanction or I'm going to tell the jury who was late

4     and why we're starting late.

5                 So, I don't want this jury to sit around

6     thinking that everyone is wasting their time.  So

7     it's important to be here.  If you get held up, I

8     know things happen, you know there can be traffic

9     problems, there can be other problems, if something

10    happens to delay you and you didn't leave in time,

11    enough in time to get here on time, then call the

12    court.

13                But I can't say 10 o'clock and then have

14    people walking in at ten-fifteen or ten-twenty and

15    just leave it at that.  All right.

16                So, I'll keep it at ten, as long as you

17    are going to be here by ten.  If you're not here by

18    ten, People and defense, I'm going to make it 9:45

19    and if you're not here by 9:45, without a

20    reasonable explanation, I'm going to sanction you,

21    pursuant to Rules of the Chief Administrator of the

22    Court, Part 130.  I've done it before; I'll do it

23    again.

24                I don't like to do it, but I will,

25    because I do not want -- it's not fair to the jury

M. Suarez/People/Direct (McCarthy)

1          A.   Yes.

2          Q.   And after that, did you speak to a female

3     assistant district attorney on videotape and give an

4     interview there as well?

5          A.   Yes.

6          Q.   And did you tell her what you've told the

7     jury now?

8          A.   Yes.

9          Q.   Where have you been since October 6th?

10         A.   Incarcerated.

11              MR. MCCARTHY:  I don't have any other

12         questions of this witness, your Honor.

13              THE COURT:  Okay, it's almost five

14         o'clock, so we're going to break for the day.

15              Members of the jury, we'll resume

16         tomorrow, same time schedule, same place, room

17         212.

18              Don't discuss the case among yourselves

19         or with anyone else.  Follow the other rules that

20         I gave you and I know you have been following, and

21         we'll resume tomorrow.

22              Return safely tomorrow morning to the

23         courthouse.  Thank you, you're excused.

24              (Whereupon, the sworn jurors exit the

25         courtroom.)

1              (Handing to Counsel.)

2         Q.   By the way, sir, did you have an opportunity

3    to read this statement, which is Defendant's Exhibit B

4    for identification, before you came here today?

5         A.   I've read it several times.

6         Q.   And you have a fairly good idea of what it

7    said, what you wrote down?

8         A.   Fairly.

9         Q.   So when you started writing this out, you

10   indicated that Tone started talking about money, right?

11        A.   That's correct.

12        Q.   That only he knew about, right?

13        A.   That's correct.

14              THE COURT:  Come up for a moment with

15         regard to this.

16              (Whereupon, the following discussion

17         takes place at sidebar among the Court and

18         Counsel, outside the hearing of the defendant and

19         sworn jurors.)

20              MR. IANNUZZI:  I'm not going to read

21         from it, if that's --

22              THE COURT:  You're referring to the

23         contents of the statement.  You can't, it's not in

24         evidence.  If you want to put it in evidence,

25         that's one thing.

432

M. Suarez/People/Cross

1           If you want to, you know, use it as a

2     prior inconsistent statement, then he has a right

3     to look at it.  But you can't just keep referring

4     to its contents and, you know, use it that way,

5     because it's not in evidence.

6           MR. IANNUZZI:  Okay.

7           THE COURT:  You've got to make a

8     decision of what you want to do with it.

9           MR. IANNUZZI:  I'm not going to put it

10    in evidence.  I'm not going to read from it.  I

11    might ask him a question about a prior

12    inconsistent statement contained in it, if he

13    makes one.

14           THE COURT:  He has a right to look at

15    it.

16           MR. IANNUZZI:  Sure.  I only have one

17    copy of that.

18           MR. MCCARTHY:  I'm just being alert as

19    to where we didn't go.  If the examination goes

20    far enough, it will probably become admissible

21    under our application.

22           THE COURT:  That's the only reason I

23    brought you up at this stage, so everybody knows

24    what they want to do with this thing.  Okay.

25           (Whereupon, the following takes place in

1        open court, in the presence of the defendant and

2        the sworn jury.)

3                  THE COURT:  You may continue.

4        Q.   Did you tell Detective Hickey, or did you

5        write out for Detective Hickey that Tone --

6                  MR. IANNUZZI:  Withdrawn.

7        Q.   Did you tell Detective Hickey that Tone was

8   talking about money that only he knew about?

9        A.   That he knew was behind the counter.

10       Q.   Right.

11       A.   Yes.

12       Q.   And Devon didn't mention the money to you,

13   did he?

14       A.   No.

15       Q.   And did you tell -- did you tell Detective

16   Hickey anything about going in the bathroom with Devon

17   and having a weapon, the magazine taken out, and seeing

18   bullets, and knowing the gun was loaded?  You never

19   told that to Hickey, did you?

20       A.   No.

21       Q.   By the way, were the police telling you what

22   to say?

23       A.   No.

24       Q.   Were they giving you the words as to what

25   happened, or were you telling them what happened?

M. Suarez/People/Cross

1      A.   They were helping me to an extent, to a

2  certain point --

3      Q.   And did -- I'm sorry, I didn't mean to

4  interrupt you.

5      A.   To a certain point, they were helping me

6  with certain parts of the statement.

7      Q.   Were they telling you what happened?

8      A.   No.

9      Q.   You were telling them yourself in your own

10  words, right?

11     A.   Yes.

12     Q.   And did you tell Detective Hickey, at about

13  nine o'clock, on October 7th -- no, October 6th, did

14  you tell Detective Hickey at about nine o'clock on

15  October 6th that Tony handed -- passed you the gun?

16     A.   That was an error due to my memory.

17     Q.   Whether it was an error, or whatever it was,

18  that's what you told him, right?

19     A.   Yes.

20     Q.   You didn't tell him Devon gave you the gun,

21  you said Tony gave you the gun.

22     A.   Yes.

23     Q.   You said, Tony gave me, paren, Mike, you're

24  Mike, the gun; is that correct?

25     A.   That's correct.

492
Smiddy - For People - Direct (McCarthy)

1           Mr. McCarthy, are we lined up for

2       another witness?

3           MR. MC CARTHY:  Always at least one

4       more for you, Judge.  Dr. Smiddy is next door.

5           THE COURT:  Okay.  People call Dr.

6       Smiddy?

7           MR. MC CARTHY:  Dr. Monica Smiddy.

8   D R.   M O N I C A   S M I D D Y,   a witness

9       called by and on behalf of the People, upon

10      being duly sworn, was examined and testified as

11      follows:

12          THE COURT:  Dr. Smiddy, please keep

13      your voice up when answering questions.

14          Mr. McCarthy, you may proceed when

15      you're ready.

16          MR. MC CARTHY:  Thanks, Judge.

17  DIRECT EXAMINATION

18  BY MR. MC CARTHY:

19      Q    Good afternoon, Dr. Smiddy.

20      A    Good afternoon, Mr. McCarthy.

21      Q    Doctor, would you tell the jurors by whom

22  you're employed?

23      A    I'm employed by the Office of the Chief

24  Medical Examiner here in New York City.

25      Q    And in what capacity do you serve there?

 1    to decide on the basis of all the evidence in the

 2    case.

 3         So, for murder in the first degree, the

 4    intent must be the intent to cause the death of

 5    another person.  That's the same for murder in the

 6    second degree, intentional murder, and there is a

 7    specific intent to forcibly steal, that's part of

 8    felony murder, as you'll hear a little later on.

 9         With regard to your determination of

10    intent, if you find that the defendant

11    intentionally shot Mr. Gerrald, it is not

12    necessary for the People to establish that the

13    intent to kill was present in the mind of the

14    defendant for any particular period or length of

15    time before the shooting.  It is sufficient if you

16    find that the intent to kill was in the mind of

17    the defendant at the time of the shooting.  The

18    element of intent to kill does not require a plan

19    to kill, nor premeditation under our law.

20         Now, according to the law, a person

21    commits robbery, and these are definitions

22    associated now with murder in the first degree,

23    according to the law, a person commits robbery

24    when he forcibly steals property.  A person steals

25    property when he commits larceny or theft, and he

1    does so with the intent to deprive another of that

2    property, and then wrongfully takes, obtains or

3    withholds it from an owner.

4         A person forcibly steals property when

5    in the course of committing a larceny or theft, he

6    uses or threatens the immediate use of physical

7    force upon another person for the purpose of

8    preventing or overcoming resistance to the taking

9    of the property.

10        A person wrongfully takes property when

11   he does so without permission of the owner or any

12   legal authority to take the property, and then

13   takes it and exercises dominion and control over

14   it for any period of time in a way that's totally

15   inconsistent with the rights of the owner.

16        And under the law the term owner means

17   anybody, any person who has a right to possession

18   of property greater than that of any alleged

19   taker, obtainer or withholder of it.

20        Now, since the statutory definition of

21   murder in the first degree also includes the

22   requirement that the victim be killed while the

23   defendant was in the course of committing or

24   attempting to commit a robbery, or while in flight

25   therefrom, I need to just define for you what an