UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

DEVON MILLINGTON,

                        Petitioner,

          -against-

WILLIAM LEE, Superintendent,
Green Haven Correctional Facility,

                      Respondent.

--------------------------------------------------------------X

   :

   :

   :

   :

   :

   :

11cv000499 (LGS) (DF)

**REPORT AND
RECOMMENDATION
AND ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/14/14

**TO THE HONORABLE LORNA G. SCHOFIELD, U.S.D.J.:**

     Petitioner Devon Millington ("Petitioner") seeks a writ of habeas corpus under 28 U.S.C.

§ 2254, following his conviction in state court, upon a jury verdict, of murder in the first degree.

(*See* Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody,

dated Jan. 18, 2011 ("Petition" or "Pet.") (Dkt. 1).)  Petitioner is currently incarcerated at the

Green Haven Correctional Facility in Stormville, New York, where he is serving a sentence of

life imprisonment without parole.  (*See id.* ¶ 3.)

     Petitioner raises two claims:  First, he claims that he received ineffective assistance of

trial counsel because (a) his counsel failed to investigate potentially mitigating evidence, and

(b) in the context of advising him about a plea offer, his counsel gave him erroneous advice

regarding the maximum sentence he could face if convicted at trial.  Second, Petitioner asserts

that the state court, in post-conviction proceedings, violated his due process rights by failing to

conduct an evidentiary hearing on his ineffective-assistance-of-counsel claims.  (*See id.*

¶¶ 15-17.)

     For the reasons set forth below, I recommend that Petitioner's due process claim be

dismissed as not cognizable on habeas review.  I further recommend, however, that a writ of

habeas corpus be granted on his ineffective-assistance claim, to the extent that claim relates to the advice given to Petitioner during plea discussions.  While Petitioner's challenge to his counsel's purported failure to investigate cannot survive scrutiny, this Court is persuaded that, in the context of advising Petitioner regarding a plea offer, Petitioner's counsel in fact misinformed Petitioner of the maximum sentence he could receive after trial.  This Court is further persuaded that counsel's erroneous advice led Petitioner to reject a plea offer that was made by the prosecution and would likely have been accepted by the trial court, which resulted in Petitioner's being sentenced, after trial, to a substantially longer prison term (life without parole) than he would have received under the terms of the plea offer (18 years to life).  Under these circumstances, a writ of habeas corpus is warranted; specifically, the prosecution should be directed to re-extend the plea offer to Petitioner and then, assuming Petitioner accepts it, to present it to the state trial court.

## BACKGROUND

### A.    Factual Background

The evidence presented by the prosecution at Petitioner's trial showed that, in the early morning hours of July 20, 2000, Petitioner and his co-defendants, Michael Suarez ("Suarez") and Anthony Stallings ("Stallings") robbed Bill and Bob's Sports Bar in the Bronx, where they had been drinking and getting high.  (*See* Record on Appeal of State Court Proceedings ("Record" or "R.") (Dkt. 10), at 1639-41[1] (People's Exhibit 24 (Written Statement of Devon Millington, dated Oct. 7, 2000)).)  During the course of the robbery, Petitioner shot and killed the bartender, Everard "Erik" Gerrald ("Gerrald").  (*See id.*)

---

[1] Unless otherwise noted, citations to the state court record refer to the document control numbers stamped on the bottom of each page.

The police arrested Petitioner on October 7, 2000. (*See id.* at 74.) Petitioner gave written and videotaped statements to the police, confessing to the crimes. (*Id.* at 1639-41; 1642-48 (People's Exhibit 25 (Transcript of Video Statement of Devon Millington, recorded Oct. 7, 2000[2])).) On October 12, 2000, a grand jury indicted Petitioner, Suarez, and Stallings for a number of crimes, including second-degree murder, and also indicted Petitioner for first-degree murder. (*See id.* at 4-9 (Indictment, dated Oct. 12, 2000).) Petitioner's father, Roy Millington ("Roy"), retained John Nicholas Iannuzzi, Esq. ("Iannuzzi") to act as Petitioner's defense counsel. (Declaration of Bari L. Kamlet, Esq., in Opposition to Petition for a Writ of Habeas Corpus, dated June 2011 ("Kamlet Decl.") (Dkt. 9), Ex. 17 (Affidavit of Roy Millington, sworn to Sept. 14, 2009 ("Roy Aff.")) ¶ 1.)

### B.      Procedural History

#### 1.      Suppression Hearing, Trial, and Direct Appeal

On April 9, 2001, Iannuzzi filed a motion seeking, *inter alia*, to suppress Petitioner's confessions as involuntarily made. (*See* R. at 10-11.) The Honorable Robert H. Straus, J.S.C., of the Bronx County Supreme Court, held a hearing on January 3-4, 2002, and determined that Petitioner's statements to the police, including his written and videotaped statements, would be admissible against him at trial. (*See id.* at 24-255; Court Ex. 2 (Dkt. 31), at 1-48.[3])

---

[2] The exhibit itself indicates that the video statement was recorded on October 7, 2006 (*see* R. at 1642), which cannot be correct, as the exhibit was introduced at Petitioner's trial in 2002. According to the testimony of a police detective, the video was recorded on October 7, 2000, the same day Petitioner made his written statement. (*See id.* at 82-83.)

[3] Court Ex. 2 consists of pages of the state court proceedings that were missing from the Record; the exhibit was introduced by the parties at an evidentiary hearing held by this Court, as described below. (*See* Section II(B)(2)(b)(i), *infra*.) For ease of reference, citations to Court Ex. 2 are to the page numbers of the document stamped onto it when filed on the docket.

Petitioner's trial, which was also conducted before Justice Straus, began on January 15, 2002. (*See* R. at 256.) The prosecution introduced, *inter alia*, Petitioner's confessions and Suarez's testimony. (*Id.* at 599-746 (testimony of Michael Suarez); 1639-41 (written statement); 1642-48 (videotaped statement).) During his testimony, Suarez acknowledged that he had accepted a plea bargain in which he would plead guilty to robbery in the first degree, testify against Petitioner, and receive a sentence of 14 years in prison. (*See id.* at 602-03.)

Petitioner took the stand in his own defense and disavowed his prior confessions, claiming that he did not participate in any crime, that he did not remember anything from the night in question, and that the police had drafted his written statement and coerced him into signing it. (*See id.* at 1191-98.) Iannuzzi called Dr. Ronald Hoffman as an expert in the field of forensic toxicology to give his opinion on the effect of Petitioner's drug use, during the night before and the day of his confessions, on the reliability of those confessions. (*See id.* at 1004.)

On January 28, 2002, the jury returned a verdict against Petitioner of guilty of murder in the first degree (*see id.* at 1383-85), and, following a sentencing hearing on April 2, 2002, Justice Straus sentenced Petitioner to life imprisonment without parole (*see* Kamlet Decl., Ex. 11 (Transcript of Sentence, conducted Apr. 2, 2002 ("Sentence Tr.")), at 35).

Iannuzzi continued to represent Petitioner on direct appeal (*see* Kamlet Decl., Ex. 1), challenging his conviction and sentence on various grounds that are not relevant here (*see id.* at 54). The Appellate Division unanimously affirmed Petitioner's conviction and sentence on February 22, 2007. *See People v. Millington*, 830 N.Y.S.2d 143 (1st Dep't 2007). On June 14, 2007, the New York Court of Appeals denied Petitioner leave to appeal from the Appellate Division's decision. *See People v. Millington*, 9 N.Y.3d 848 (2007).

4

## 2.    State Collateral Proceedings

Represented by new counsel, Andrea G. Hirsch, Esq. ("Hirsch"), Petitioner applied to the

Appellate Division for a writ of error *coram nobis* on September 8, 2008, alleging that Iannuzzi

had provided ineffective assistance of appellate counsel. (*See* Kamlet Decl. ¶ 9 & Ex. 18.)

Petitioner argued that many of the claims that Iannuzzi had raised on appeal were baseless, and

that, as appellate counsel, Iannuzzi had failed to raise the claim that he, himself, was ineffective

in his role as trial counsel. (*See id.*)  On May 7, 2009, the Appellate Division denied Petitioner's

application (*see* Kamlet Decl., Ex. 3), and, on October 30, 2009, the Court of Appeals denied

leave to appeal (*see* Kamlet Decl., Ex. 4).

Meanwhile, on October 15, 2009, Petitioner, again through Hirsch, also filed a motion

pursuant to Section 440.10 of the New York Criminal Procedure Law, claiming ineffective

assistance of trial counsel due to Iannuzzi's alleged failures (1) to investigate Petitioner's

background and to have him examined by a psychiatrist prior to entering into plea negotiations

and sentencing, and (2) to advise Petitioner properly with respect to accepting a plea offer. (*See*

Kamlet Decl., Ex. 5 (Notice of Motion to Vacate Judgment and Set Aside Sentence, dated

Oct. 15, 2009; Affirmation of Andrea G. Hirsch, Esq., dated Oct. 15, 2009; Memorandum of

Law, dated Oct. 15, 2009 ("Pet. § 440.10 Mem.")).)

Among the documents Petitioner submitted to the state court, in support of his

Section 440.10 motion, were his own affidavit (Letter to the Court from Assistant District

Attorney ("ADA") Bari L. Kamlet, dated July 26, 2011 ("Kamlet Ltr.") (Dkt. 33), Ex. 3

(Affidavit of Devon Millington, sworn to Sept. 15, 2009 ("Pet. Aff."))), an affidavit by his

brother Errol Millington ("Errol") (Kamlet Decl., Ex. 16 (Affidavit of Errol Millington, sworn to

Aug. 26, 2009 ("Errol Aff."))), an affidavit by his father (Roy Aff.), and a letter from a

5

psychiatrist, Dr. Eric Goldsmith ("Goldsmith") (*see* Kamlet Decl., Ex. 9 (Letter from Eric

Goldsmith, M.D. to Andrea G. Hirsch, Esq., dated Oct. 14, 2009 ("Goldsmith Ltr."))).

Much of the documentation Petitioner submitted on his Section 440.10 motion related to

purportedly mitigating evidence that Petitioner claimed his trial counsel, Iannuzzi, had failed to

develop. This documentation included, *inter alia*, evidence of an incident of boyhood sexual

abuse that Petitioner had experienced and a lengthy history of drug and alcohol dependency,

which, according to Goldsmith, had reached the point where, for Petitioner, substance abuse was

"no longer a choice." (Goldsmith Ltr., at 4.[4]) Goldsmith opined that, in order to cope with the

trauma that followed the early incident of sexual abuse, Petitioner "began drinking heavily and

using drugs to self-medicate," and that "the drugs and alcohol were so debilitating that, when

[Petitioner] was in an emotionally charged situation and intoxicated[,] he was so disinhibited that

he was unable to effectively apply the necessary emotional brakes." (*Id.*) Commenting on a

view expressed by the sentencing judge that Petitioner appeared to lack regret for his actions,

Goldsmith further opined that Petitioner's apparent "emotional detachment" was indicative of

"chronic posttraumatic symptoms." (*Id.* at 5.)

In connection with his claim regarding the plea advice that Iannuzzi allegedly gave him,

Petitioner stated in his affidavit that Iannuzzi had told him that the maximum sentence he could

face if convicted was 25 years to life in prison. (*See* Pet. Aff. ¶ 8.) Petitioner also stated that, at

some point, Iannuzzi told him that he was attempting to negotiate a 15-year sentence for

Petitioner under a plea deal, but that the prosecution was only offering 20 years to life. (*See id.*)

Petitioner further maintained that, "[j]ust before trial," the prosecutor offered a plea deal of

---

[4] The Court has assigned consecutive pages numbers to Goldsmith's letter for ease of
reference.

18 years to life, but Iannuzzi "discouraged" Petitioner from accepting that deal, telling Petitioner: "'18 to life, 25 to life, what's the difference?'" (*Id.*)  Petitioner informed the court that, after conducting his own legal research, he told Iannuzzi that he believed he could be sentenced to "natural life," but, according to Petitioner, Iannuzzi insisted that 25 years to life was the maximum. (*Id.*)  Petitioner claims that he "followed Iannuzzi's advice" not to accept the plea deal "because [he] thought [Iannuzzi] knew best." (*Id.*)  Petitioner requested an evidentiary hearing so that the trial court could make credibility determinations and findings of fact regarding his post-conviction claims. (*See* Pet. § 440.10 Mem., at 11.)

In opposition to Petitioner's Section 440.10 motion, Respondent submitted, *inter alia*, an affirmation by ADA Daniel McCarthy ("McCarthy") (Kamlet Decl., Ex. 10 (Affirmation of Daniel T. McCarthy, Esq., dated Feb. 24, 2010 ("McCarthy Aff."))) and an affirmation by Iannuzzi (*id.*, Ex. 12 (Affirmation of John Nicholas Iannuzzi, Esq., dated Feb. 24, 2010 ("Iannuzzi Aff."))).  In his affidavit, McCarthy stated that "had trial counsel informed [him] of [Petitioner's] background, and provided [him] with Dr. Goldsmith's report, [he] would not have viewed that information as a basis to extend any plea offer to [Petitioner]." (McCarthy Aff. ¶ 2.)  Further, despite the fact that the transcript of a pre-trial proceeding contained a representation to the court, made by one of McCarthy's colleagues, that "McCarthy says the offers have been made, to be accepted or not" (*see* Kamlet Ltr., Ex. 21 (Transcript of Calendar Call, conducted Dec. 3, 2001 ("12/3/01 Tr."), at 2), McCarthy stated in his affidavit to the trial court that he "d[id] not recall" extending a plea offer to Petitioner (McCarthy Aff. ¶ 2).  Similarly, Iannuzzi stated that he "d[id] not recall" conversations with the prosecution regarding a plea offer (Iannuzzi Aff. ¶ 5), and that he had no recollection of specific conversations with Petitioner or of discouraging Petitioner from accepting a plea offer (*id.* ¶¶ 3, 6).

7

The state court denied Petitioner's Section 440.10 motion in its entirety on November 22,

2010, without holding the evidentiary hearing that Petitioner had requested. (*See* Kamlet Decl.,

Ex. 6 (Decision and Order of the Supreme Court, dated Nov. 22, 2010 ("Section 440.10

Opinion")).) The court stated, in relevant part:

> Taking all the evidence before this Court into consideration, the
> Court finds no basis to conclude that trial counsel's representation
> of [Petitioner] was ineffective. Applying the standard enunciated
> in *People v. Baldi*, 54 N.Y.2d 137 (1981), this Court concludes:
> 1) despite the overwhelming evidence of guilt, [Iannuzzi]
> presented a well grounded defense; and 2) that [Iannuzzi] exhibited
> a "reasonable competence" in his representation of [Petitioner]. As
> stated in *Baldi*, "[a]n attorney who presents a well grounded but
> unsuccessful defense will not be held to have provided ineffective
> assistance of counsel, and thus a defendant will not be entitled to a
> vacatur of his conviction on such basis."

(Section 440.10 Opinion, at 4.)

On January 6, 2011, Petitioner requested leave to appeal to the Appellate Division from

the denial of his Section 440.10 motion. (*See* Kamlet Decl., Ex. 7.) On April 14, 2011, the

Appellate Division summarily denied leave to appeal. (*See* Kamlet Decl., Ex. 8.)

## C.    **Federal Habeas Petition**

Petitioner filed the instant habeas petition *pro se* on January 18, 2011,[3] asserting the same

claims that he raised in his Section 440.10 motion. (*See* Pet. ¶¶ 15-17.)

On June 20, 2011, Respondent filed an opposition to the Petition. (*See* Kamlet Decl. &

attached Memorandum of Law, dated June 2011 (Dkt. 9).) Shortly thereafter, on July 4, 2011,

---

[3] Although the Court's docket reflects a filing date of January 21, 2011 for the Petition
(Dkt. 1), a *pro se* prisoner's papers are deemed filed when they are handed over to prison
officials for forwarding to the Court. *See Houston v. Lack*, 487 U.S. 266, 270 (1988). Thus, in
the absence of evidence to the contrary, the Court will deem the Petition to have been filed on
January 18, 2011, the date Petitioner signed it. *See, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d
160, 165 (S.D.N.Y. 2000).

Hirsch filed a notice of appearance on Petitioner's behalf. (*See* Dkt. 12.) On October 6, 2011, Petitioner, through Hirsch as counsel, filed his reply papers. (*See* Petitioner's Reply to the State's Opposition Papers ("Pet. Reply") (Dkt. 15).)

### D.    This Court's Preliminary Findings and Evidentiary Hearing

By Order dated November 13, 2013 (the "November Order") (Dkt. 21), this Court found that an evidentiary hearing before the Court would be both permissible under the law and warranted, with respect to Petitioner's particular claim that, during plea negotiations, his counsel had given him materially erroneous information regarding his potential maximum sentence, and, based on that erroneous information, counsel had discouraged Petitioner from accepting a plea. (*See* Section II(B)(2)(a), *infra*.) This Court held such an evidentiary hearing on January 22, 2014, to develop the record with respect to that aspect of Petitioner's ineffective-assistance claim. As explained below, certain further documentary evidence was introduced, and the Court heard testimony from Petitioner, Roy, Errol, and Iannuzzi. (*See generally* Transcript of Proceedings, conducted Jan. 22, 2014 ("Habeas Hr'g Tr.") (Dkt. 22).)

### DISCUSSION

## I.    APPLICABLE LEGAL STANDARDS

### A.    Statute of Limitations

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires habeas petitions to be filed within one year of the latest of four dates, the relevant one in this case being "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Here, Petitioner's habeas petition was timely filed.

Petitioner's judgment of conviction was entered on January 28, 2002. (*See* R. at 1383-85.) On February 22, 2007, the Appellate Division affirmed, *see People v. Millington*, 830 N.Y.S.2d 143 (1st Dep't 2007), and on June 14, 2007, the Court of Appeals of New York denied Petitioner leave to appeal, *see People v. Millington*, 9 N.Y.3d 848 (2007). Petitioner's conviction became final 90 days later, on September 12, 2007, when the time for seeking certiorari expired. *See Saunders v. Senkowski*, 587 F.3d 543, 547 (2d Cir. 2009) ("[T]he limitations period for state prisoners therefore begins to run only after the denial of certiorari or the expiration of time for seeking certiorari." (internal quotation marks and citation omitted)); 28 U.S.C. § 2101(c) (providing 90 days to seek certiorari with the United States Supreme Court).

On September 8, 2008 – 362 days after his conviction became final – Petitioner filed his motion for a writ of error *coram nobis*, tolling the statute of limitations. *See* 28 U.S.C. § 2244(d)(2). On May 7, 2009, the Appellate Division denied that motion (*see* Kamlet Decl., Ex. 3), and the Court of Appeals denied leave to appeal on October 30, 2009 (*see id.*, Ex. 4).

In the meantime, Petitioner additionally filed, on October 15, 2009, a Section 440.10 motion in Bronx County Supreme Court. (*See* Kamlet Decl., Ex. 5.) The Section 440.10 motion also tolled the statute of limitations. *See, e.g., King v. Greiner*, No. 02cv5810 (DLC), 2003 WL 57307, at *1 (S.D.N.Y. Jan. 7, 2003). The Bronx County Supreme Court denied Petitioner's Section 440.10 motion on November 22, 2010,[4] but the notice of entry was not mailed to Petitioner until December 9, 2010. (*See* Kamlet Decl., Ex. 7.)

---

[4] The Petition incorrectly states that Bronx County Supreme Court denied the Section 440.10 motion on November 22, 2009. (*See* Pet. ¶ 10.) The decision itself indicates the date as November 22, 2010. (*See* Section 440.10 Opinion, at 4.)

On January 6, 2011, Petitioner filed a motion, which was deemed timely, for leave to appeal the denial of his Section 440.10 motion (*see* Kamlet Decl., Exs. 7, 8; 22 N.Y.C.R.R. § 600.8(d)(1) (appeals to the Appellate Division due "30 days after service of the order upon the applicant")), continuing to toll the statute of limitations. *See Evans v. Chavis*, 546 U.S. 189, 191 (2006); *Bethea v. Girdich*, 293 F.3d 577, 578 (2d Cir. 2002); *Wilkins v. Kirkpatrick*, No. 06cv2151 (SCR) (LMS), 2009 WL 3644082, at *7 (S.D.N.Y. Nov. 4, 2009).

On January 18, 2011, prior to the decision on his Section 440.10 appeal, Petitioner filed the instant Petition. As the one-year statute of limitations thus ran for only 362 days, the Petition was timely filed.

### B.   Exhaustion

As a general matter, a federal court may not consider a petition for a writ of habeas corpus unless the petitioner has exhausted the remedies available in the state courts. 28 U.S.C. § 2254(b)(1)(A); *see also Baldwin v. Reese*, 541 U.S. 27 (2004); *Picard v. Connor*, 404 U.S. 270, 275 (1971). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "'opportunity to pass upon and correct' alleged violations of . . . prisoners' federal rights." *Picard*, 404 U.S. at 275 (quoting *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)). A petitioner may accomplish this in several ways, including by citing relevant provisions of the federal Constitution in his appellate brief, *see Davis v. Strack*, 270 F.3d 111, 122-23 (2d Cir. 2001), or by relying on "pertinent federal cases employing constitutional analysis," *Rustici v. Phillips*, 308 F. App'x 467, 469 (2d Cir. 2009) (internal quotation marks and citation omitted).

Aside from setting out the federal nature of his claims, the petitioner must also, for purposes of the exhaustion requirement, present those claims to "the highest court of the

11

pertinent state." *Larocco v. Senkowski*, 65 F. App'x 740, 742 (2d Cir. 2003); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (citation omitted). In New York, for a claim that can be raised on direct appeal, a petitioner must first appeal his conviction to the Appellate Division and then seek "further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). A request for leave to appeal to the Court of Appeals may be made by a letter submission that encloses the briefs and other documents that were before the lower courts. *See id.* A court will deem the exhaustion requirement satisfied where the "fair import" of the total application suggests a request for review of the constitutional claims raised in those submissions. *Id.* at 75-77.

To exhaust a claim raised before the state trial court in a collateral post-conviction motion, as in a motion made pursuant to Section 440.10 of the New York Criminal Procedure Law, the petitioner must seek leave to appeal the denial of the motion. *See Ture v. Racette*, No. 9:12-cv-01864-JKS, 2014 WL 2895439, at *4 (N.D.N.Y. June 26, 2014) (claim unexhausted where petitioner did not seek to appeal denial of Section 440.10 motion); *see also Klein v. Harris*, 667 F.2d 274, 283-84 (2d Cir. 1981); *Ramos v. Walker*, 88 F. Supp. 2d 233, 234 n.3 (S.D.N.Y. 2000) (noting that "[a]n order denying a Section 440.10 is appealable to the intermediate appellate court by leave of a judge thereof granted under Section 460.15[,] . . . [although] [t]here is no provision in New York law for an appeal to the Court of Appeals from an order denying leave to appeal from an order denying a Section 440.10 motion" (internal citations omitted)).

In this case, Petitioner raised his ineffective-assistance-of-counsel claim in a post-conviction Section 440.10 motion brought before the trial court. (*See* Kamlet Decl., Ex. 7 (Memorandum of Law), at 6-7.) He raised the claim in federal terms, by relying on federal cases

employing constitutional analysis. (*See id.*)  In then seeking leave to appeal to the Appellate

Division, Petitioner reiterated this claim and also expressly argued that, by denying him a

hearing on his motion, the trial court had "violated his constitutional right to due process and his

derivative right to a full and fair hearing." (*See id.* (Affirmation of Andrea G. Hirsch, Esq., dated

Jan. 6, 2011), at 8.)  Thus framed, Petitioner's constitutional claims were "fairly presented" to

the state courts. *See Baldwin*, 541 U.S. at 29.

  As noted above, however, Petitioner did not wait for the Appellate Division to rule on his

application for leave to appeal, before he filed his habeas petition in this Court.  Rather, relying

on dicta in *Pace v. DiGuglielmo*, 544 U.S. 408 (2005), Petitioner suggested in his Petition that, in

light of the fact that the statute of limitations had nearly expired (with only three days left to

run), he was entitled to file a federal petition "protectively."  (Pet., at 1; *see also Pace*, 544 U.S.

at 416 (noting that a prisoner trying in good faith to exhaust state remedies may avoid the

"predicament" of having his federal habeas petition time-barred "by filing a 'protective' petition

in federal court and asking the federal court to stay and abey the federal habeas proceedings until

state remedies are exhausted").)  More specifically, Petitioner filed prior to the full exhaustion of

his claims in order to ensure that they would not become time-barred if a decision by the

Appellate Division were to end the statutory tolling of the AEDPA limitations period before he

could file in this Court.  (*See* Pet., at 1.)  Given that Petitioner was not mailed notice of the trial

court's decision on his Section 440.10 motion for more than two weeks after that decision was

issued, it was reasonable for Petitioner to fear a similar lapse in time before he received the

decision of the Appellate Division.  Indeed, if there were any delay in mailing – or even if notice

were mailed promptly but took three days to reach him – then Petitioner would likely miss his

deadline to file a federal habeas petition.  (*See id.* (Petitioner stating: "If . . . I were to wait to file

13

this petition until after I received a decision from the New York Appellate Division . . . and I then filed this petition, the petition would be untimely.").)

Under the particular circumstances presented, it was within this Court's discretion to stay these proceedings and hold them in abeyance pending full exhaustion of Petitioner's claims. In particular, a stay was warranted because (1) Petitioner had made substantial efforts to exhaust his claims prior to commencing this proceeding, (2) he had good cause for filing the Petition when he did, given realistic concerns about the running of the statute of limitations, and (3) at least one of his claims appeared to be a strong one. *See Rhines v. Weber*, 544 U.S. 269, 276-79 (2005) (describing guidelines for courts' exercise of discretion in staying habeas proceedings). Certainly, this is not a case in which a petitioner sought to "drag[] out indefinitely [his] federal habeas review." *Id.* In fact, approximately three months after Petitioner filed his "protective" Petition, his application for leave to appeal to the Appellate Division was denied (*see* Kamlet Decl., Ex. 8), eliminating any concern that review of Petitioner's claims by this Court would deprive the state courts of the first opportunity to consider them.

Thus, to the extent necessary for the sake of the record, this Court finds that it was appropriate for Petitioner to have filed a "protective" petition to avoid the risk of forfeiting his claims, and grants his application for a stay, *nunc pro tunc* to the date the Petition was filed. *See Pace*, 544 U.S. at 416; *see also Panetti v. Quarterman*, 551 U.S. 930, 945-46 (2007) (noting that, in interpreting AEDPA's requirements, the purposes of the statute and the practical effects of precedent should be considered, and that "[t]his is particularly so when petitioners 'run the risk' under the proposed interpretation of 'forever losing their opportunity for any federal review of their unexhausted claims'") (quoting *Rhines*)); *Haynes v. Ercole*, No. 08-CV-3643 (JFB), 2009 WL 580435, at *1 (E.D.N.Y. Mar. 6, 2009) (finding good cause for staying habeas petition

14

where petitioner had filed a "'protective habeas' to ensure its timeliness"); *Brown v. Ebert*, No. 05cv5579 (DLC) (KNF), 2006 WL 1273830, at *2-3 (S.D.N.Y. May 9, 2006) (finding that petitioner had shown good cause for failing to exhaust his claims, in part because he followed the procedure set forth in *Pace* by filing a "protective" petition).

### C.   Standard of Review

Under AEDPA, federal courts owe substantial deference to the decisions of state courts, where the state courts have adjudicated constitutional claims on the merits. *See* 28 U.S.C. § 2254(d) (2006); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) ("'Adjudicated on the merits' has a well settled meaning:  a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.").

AEDPA establishes a standard of review that is, by design, "difficult to meet." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).  A federal court may only issue a writ of habeas corpus if the state court adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  Further, a state court's factual findings are presumed to be correct and can only be overcome by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The requirement that federal law be "clearly established" limits petitioners to citing the "holdings, as opposed to the dicta of [the] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000) ("*Terry Williams*")).  A state court decision is not "contrary to" clearly

established federal law unless it either (1) applies a rule that is "antithetical" to Supreme Court precedent, or (2) "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result. *Terry Williams*, 529 U.S. at 405-06; *Rosario v. Ercole*, 601 F.3d 118, 123 (2d Cir. 2010). For a decision to be an "unreasonable application" of clearly established law, a state court must correctly identify the governing legal principle, but then apply that principle unreasonably to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003). An "unreasonable application" of clearly established law within the meaning of AEDPA is not merely an incorrect application of clearly established law. Rather, it is an application "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.

Similarly, a state court's factual determinations are not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290 (2010). A state court's factual determinations may only be rebutted by clear and convincing evidence, *see* 28 U.S.C. § 2254(e)(1), and a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding," *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(d)(2)). These standards, however, while "demanding," are "not insatiable," *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005), and "[d]eference does not by definition preclude relief," *id.* (quoting *Cockrell*, 537 U.S. at 340). A factual determination may be unreasonable if it "cannot reasonably be reconciled" with the record before the state court. *Jones v. Murphy*, 694 F.3d 225, 235 (2d Cir. 2012).

16

## II.   PETITIONER'S CLAIMS

### A.   Due Process Violation

This Court cannot review Petitioner's claim that, by failing to hold an evidentiary hearing

during post-conviction proceedings to resolve his ineffective-assistance claims, the trial court

violated his due process rights.  (*See* Pet. ¶ 17.)  In this circuit, such a claim is not cognizable in a

federal habeas proceeding.  *Word v. Lord*, 648 F.3d 129, 131 n.5, 132 (2d Cir. 2011) (holding,

*per curiam*, that "alleged errors in a postconviction proceeding are not grounds for § 2254 review

because federal law does not require states to provide a post-conviction mechanism for seeking

relief," while acknowledging that two other circuits had rejected such a *per se* rule); *see also*

*Diaz v. Greiner*, 110 F. Supp. 2d 225, 235 (S.D.N.Y. 2000) (noting that "federal habeas relief is

not available to redress alleged procedural errors in state post-conviction proceedings" (internal

quotation marks and citation omitted)).  Accordingly, I recommend that this claim be dismissed.

### B.   Ineffective Assistance of Trial Counsel

For purposes of AEDPA, the standard enunciated in *Strickland v. Washington*, 466 U.S.

668 (1984), has generally been accepted as "clearly established federal law" for determining

whether, under the guarantees of the Sixth Amendment, a criminal defendant has received

constitutionally effective assistance of counsel.  *See, e.g., Terry Williams*, 529 U.S. at 391.  To

prevail on an ineffective-assistance claim under *Strickland*, a defendant must show that:

(1) counsel's performance "fell below an objective standard of reasonableness" in light of

prevailing professional norms; and (2) "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

U.S. at 688, 694.  The New York state constitutional standard, explicated in *People v. Baldi*, 54

N.Y.2d 137 (1981), differs in some ways from the federal constitutional standard under

17

*Strickland*, but not in material respects, for purposes of analysis under AEDPA, *see Rosario*, 601 F.3d at 126 (holding that "the New York state standard for ineffective assistance of counsel is not contrary to [federal law]"); *Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir. 2001) (*Baldi* "is not 'diametrically different, opposite in character or nature, or mutually opposed' to" federal standards (quoting *Terry Williams*, 529 U.S. at 405)).

Here, the last-reasoned decision of the state courts (*i.e.*, the decision of the trial court, on Petitioner's Section 440.10 motion) rejected Petitioner's ineffective-assistance claims on the merits by finding that, under *Baldi*, the state court had "no basis to conclude that trial counsel's representation of [Petitioner] was ineffective."  (Section 440.10 Opinion.)  While the state court did not address the specifics of Petitioner's claims about the deficiencies in Iannuzzi's performance, and even though *Baldi* was a state-law case, the court's express reliance on *Baldi* is sufficient to deem Petitioner's federal constitutional claims to have been "adjudicated on the merits," 28 U.S.C. § 2254(d), such that this Court's review of Petitioner's ineffective assistance of counsel claim is governed by AEDPA, *see Rosario*, 601 F.3d at 126; *Lindstadt*, 239 F.3d at 198 (2d Cir. 2001); *Watkins v. Perez*, No. 05cv477 (GEL), 2007 WL 1344163, at *8 (S.D.N.Y. May 7, 2007) (noting that a New York court "'adjudicates' a federal ineffective-assistance claim 'on the merits if it applies or simply cites *Baldi*'").

1.     <u>Counsel's Alleged Failure to Investigate Petitioner's Background</u>

Petitioner contends that his trial counsel failed to conduct an adequate investigation into potentially mitigating circumstances in Petitioner's background, and that, if counsel had investigated thoroughly, then he would have been able to negotiate a more favorable plea bargain or to obtain a more lenient sentence after trial.  (*See* Pet. ¶¶ 15, 17.)  Petitioner cannot prevail on this claim because, as a threshold matter, he cannot show that it is "clearly established" by the

holdings of the Supreme Court that a criminal defense attorney has a constitutional duty to investigate mitigating evidence, except with respect to capital sentencing. Further, even if such a duty were found to exist, and even if Iannuzzi were found to have failed to fulfill that duty, Petitioner cannot show that he suffered prejudice as a result, as required under *Strickland*. Thus, this Court cannot conclude that the state court's rejection of this aspect of Petitioner's ineffective-assistance claim was contrary to, or constituted an unreasonable application of, clearly established federal law.

### a.    Failure to Show a Violation of "Clearly Established Federal Law"

While *Strickland* itself constitutes "clearly established federal law," *see Terry Williams*, 529 U.S. at 391, and although the very conduct at issue in *Strickland* was counsel's failure to investigate matters relevant to sentencing, *see* 466 U.S. at 690, *Strickland* was a capital case. The Supreme Court expressly reserved opinion as to whether the standards of conduct that it was articulating should apply in a non-capital context. *See id.* at 686 (noting that the Court "need not consider the role of counsel in an ordinary sentencing, which may involve informal proceedings and standardless discretion in the sentencer, and hence may require a different approach to the definition of constitutionally effective assistance"). Subsequent to *Strickland*, whenever the Supreme Court has specifically clarified the extent of counsel's duty to investigate, it has done so in the context of capital sentencing proceedings. *See, e.g., Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Terry Williams*, 529 U.S. at 362. This has caused the Second Circuit to observe that it is "by no means clear" that defense counsel has a constitutional duty to investigate mitigating evidence, *except* in the context of capital sentencing. *U.S. v. Herrera*, 186 F. App'x 109, 112 (2d Cir. 2006) (summary order). Other courts have reached similar conclusions. *See, e.g., Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006)

19

(noting that "there is no clearly established federal law as determined by the Supreme Court in this context [of counsel's performance in non-capital sentencing]" (internal citation omitted)); *Flores v. Ercole*, No. 09-CV-602 (DLI), 2010 WL 3951048, at *8 (E.D.N.Y. Oct. 7, 2010) (questioning "whether the issue of counsel's meaningful representation at sentencing is cognizable on habeas review").

The Supreme Court has directed that "garden-variety applications" of *Strickland* to new and varied factual circumstances do not produce new constitutional rules, *Chaidez v. U.S.*, 133 S. Ct. 1103, 1107 (2013), but it has also cautioned that "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error," *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (emphasis in original; internal citation omitted). Given the precedent cited above, it is difficult for this Court to conclude that examining the adequacy of defense counsel's investigation of potentially mitigating evidence, in the context of a non-capital case, would merely be a "garden-variety application" of *Strickland*. It is thus difficult to see how Petitioner could meet his burden, under AEDPA, of demonstrating that the state court's denial of his ineffective-assistance claim was contrary to, or represented an unreasonable application of, "clearly established federal law." 28 U.S.C. § 2254(d).

### b.   Failure to Show the Prejudice That *Strickland* Would Require

Even if the *Strickland* standard were applicable to Petitioner's claim regarding his trial counsel's alleged failure to investigate, Petitioner would be unable to meet that standard. In particular, regardless of whether his counsel's investigation was deficient, Petitioner cannot show that any such deficiency resulted in actual prejudice. *See Strickland*, 466 U.S. at 697 (holding that both prongs of the test for ineffective assistance must be satisfied, and that, "[i]f it

20

is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"); *Parker v. Ercole*, 666 F.3d 830, 834 (2d Cir. 2012) (noting that the court "need only consider the second prong" of *Strickland* to resolve the petitioner's ineffective-assistance-of-counsel claim).

Petitioner claims that if his counsel, Iannuzzi, had investigated adequately, then Iannuzzi would have discovered that, as a young child, Petitioner had once been subjected to sexual abuse by his older half-brother; that it was difficult for Petitioner to speak about that incident; that he had attempted suicide on three occasions during his youth; that he had experienced difficulty in school; that he had heavily abused drugs and alcohol from an early age; and that he had fought often and engaged in reckless behavior. (*See* Pet. Aff. ¶¶ 2-5.) According to Petitioner, had Iannuzzi uncovered this information, he would have been obligated to have Petitioner examined by a psychiatrist, who (like Goldsmith) would then have been able to show that Petitioner's drug abuse – supposedly his method of self-medicating to cope with his past molestation – was beyond his control, and that his reckless and aggressive behavior, including his participation in the robbery and shooting for which he was convicted, was directly linked to the same childhood abuse. (*See* Pet. Reply, at 63-65.)

As an initial matter, Petitioner has not demonstrated that a diligent investigation by Iannuzzi would necessarily have led to the retention of a psychiatrist and the presentation of that psychiatrist's findings either to the prosecution, in connection with plea discussions, or to the court, in connection with sentencing. Rather, based on some of the potentially damaging information that an investigation would apparently have revealed – such as the extent of Petitioner's substance abuse and past pattern of reckless behavior (*see* Goldsmith Ltr., at 2-5) – counsel might have made a strategic decision not to obtain a psychiatrist's report, or not to

21

present one, if obtained.  As the Supreme Court stated in *Strickland*, "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  466 U.S. at 689-90.

More critically, the record does not support Petitioner's hypothesis that additional information about his background and a psychiatric report like the one prepared by Goldsmith would have made a difference to either the prosecutor or the sentencing judge, resulting in a more favorable outcome to him.  Petitioner has offered nothing but speculation to rebut the prosecutor's unequivocal statement, placed before the state court in opposition to Petitioner's Section 440.10 motion, that, had trial counsel informed him of Petitioner's background and provided him with the same psychiatrist's report that Petitioner ultimately obtained, he "would not have viewed that information as a basis to extend any plea offer to [Petitioner]."  (McCarthy Aff. ¶ 2.)

Similarly, Petitioner cannot avoid the comments made by the court at sentencing, which suggest that such information would likely have made little, if any, difference to the outcome. The sentencing judge, who was already aware from the pre-sentence report that Petitioner had a history of substance abuse (*see* Sentence Tr., at 12-13), stated that, in his view, Petitioner's drug use was not a mitigating factor, but rather an aggravating factor, because "it's a choice to throw away restraints and to do whatever you please with other people" (*id.* at 31-32).  The judge further indicated that he had formed, at trial, an impression of Petitioner as someone who "sought to hide behind drug use as some sort of explanation for taking the life of an innocent person."  (*Id.* at 32.)  Perhaps most importantly, the court stated:

> [W]hat stands out in my mind as possibly the most significant
> factor is the fact that [Petitioner] shot Mr. Gerrald in the head three

times.  Not once to initially drop him to the ground, and that would
have been enough and perhaps he would have lived, perhaps not,
but then to in effect complete an execution of Mr. Gerrald by firing
two more shots into his head, which guaranteed his death for no
reason except just overall mean spiritedness, anger, whatever you
want to call it, personal choice, gratification, it was done. . . .

He has committed the act of a person filled with whether it's anger,
hatred, greed, it makes no matter, because he did what he did.  He
won't own up to it.  He tried to evade responsibility and he was
unsuccessful in that. . . .

[U]nder all the circumstances I don't feel that any other sentence is
justified but the most severe sentence for the most severe crime,
murder of an innocent person during the course of a robbery.  And
what sells it for me are the three bullets in the head.  That's what
separates [Petitioner's] act from that of someone else who may be
a murderer, but who I might find in him some sparks of sadness
over the occasion or regret or mistake or whatever.  I don't find
any of that here.

(*Id.* at 33-35.)

Petitioner contends that a psychiatrist could have explained the nature of Petitioner's drug

and alcohol dependency, and thereby refuted the judge's suggestion that Petitioner had made a

conscious "choice" to act without restraint.  Without the benefit of hindsight knowledge of the

court's comments at sentencing, however, there can be no assurance that a psychiatrist would

even have thought to address that particular point.  Moreover, even Goldsmith, whom Petitioner

eventually retained in connection with his Section 440.10 motion, and who was able to review

and attempt to address all of the sentencing judge's remarks, never opined that Petitioner's

denials of his involvement in the killing were connected to his childhood abuse or any other

mitigating aspect of his background.  (*See* Goldsmith Ltr., at 5.)  Yet it was this failure to accept

responsibility, combined with the deliberate nature of Petitioner's firing two more bullets into

Gerrard's head, after he was already on the ground, that the judge found "separate[d]" Petitioner's crime from other murders.  (Sentence Tr., at 35.)[5]

Finally, as noted above, some of the evidence that, according to Petitioner, would have been viewed by the court as lessening his culpability, could equally well have been viewed as aggravating.  For example, among the information reported by Goldsmith was that Petitioner described himself as a person who got into fights with strangers, was easily provoked, and had had lots of confrontations, including a knife fight in which he had been stabbed in the neck.  (*See* Goldsmith Ltr., at 2.)  While the court may have accepted that Petitioner's history of recklessness and violence stemmed from his childhood abuse, it may also have considered such an admitted history to counterbalance his lack of documented prior criminal activity.

For all these reasons, while it is possible that Petitioner would have received a more lenient plea offer or sentence if additional mitigating evidence had been discovered, there could certainly be "fairminded disagreement" about whether, under *Strickland*, a more favorable result was reasonably probable.  *See Richter*, 131 S. Ct. at 786-87.  Accordingly, even if *Strickland* should be found to apply in the context presented, this Court cannot conclude that the state court's rejection of Petitioner's challenge to the adequacy of his trial counsel's investigation was "contrary to," or an "unreasonable application of," *Strickland*.  *See* 28 U.S.C. §2254(d).  Thus, Petitioner cannot satisfy his burden under AEDPA, and this portion of Petitioner's ineffective-assistance claim should be dismissed.

---

[5] While Petitioner now faults Iannuzzi for his own false trial testimony, claiming that Iannuzzi advised him to lie under oath, and for his lies to the probation officer during his pre-sentence interview, claiming that Iannuzzi failed to prepare him (*see* Kamlet Decl., Ex. 5 (Memorandum of Law, at 16 n.5)), even these contentions could be viewed as further attempts by Petitioner to blame others and avoid taking responsibility for his conduct.

2. **Counsel's Alleged Failure, During Plea Discussions, To Advise Petitioner Correctly of the Maximum Sentence He Could Face at Trial**

As noted above, this Court held an evidentiary hearing on the question of whether Iannuzzi advised Petitioner ineffectively during plea negotiations.  Based on the evidence adduced at that hearing, this Court concludes that Petitioner has a meritorious habeas claim that warrants relief.

a. **This Court's Preliminary Determination of an AEDPA Violation, and Subsequent Holding of an Evidentiary Hearing**

The first question that was presented to this Court, with respect to Petitioner's claim that his counsel misadvised him of his potential sentence, was whether the state court's denial of this claim violated Section 2254(d) of AEDPA.  That question needed to be answered based on the record that was before the state court, without any further development of the facts by this Court.  *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  Based on the troubling affidavits and pre-trial transcripts that Petitioner placed before the trial court on his Section 440.10 motion and the lack of any meaningful rebuttal by the State, this Court made a preliminary finding that the trial court had, indeed, either unreasonably applied *Strickland* to Petitioner's claim, in violation of Section 2254(d)(1), or, by rejecting Petitioner's claim without a hearing, made an unreasonable determination of the facts in light of the evidence in the record, in violation of Section 2254(d)(2).  (*See* November Order.)

Attached to this Report and Recommendation is a copy of the Court's fairly lengthy November Order, which is fully incorporated herein by reference.  Although this Court will not repeat all of its reasoning herein, a brief summary is warranted.  In short, this Court found that, in rejecting Petitioner's claims on the merits, the trial court could only have decided one of two things:  either that Petitioner's version of the facts, as presented by affidavit to that court, was

25

true; or that some or all of it was false. (*See id.* at 11.) If the trial court accepted Petitioner's

recitation of facts as *true* (in other words, if the court accepted that Iannuzzi misinformed

Petitioner of the maximum sentence that he could receive, if convicted, and that Petitioner

rejected a plea offer as a result of this misinformation), then the trial court's rejection of

Petitioner's ineffective-assistance claim constituted an unreasonable application of *Strickland* to

those facts, in violation of 28 U.S.C. § 2254(d)(1). (*See* November Order, at 12-13; *see also*

*Lafler v. Cooper*, 132 S. Ct. 1376 (2012) (finding a violation of *Strickland* where the petitioner

had rejected a plea offer based on his attorney's deficient advice).) If, on the other hand, the trial

court, without a hearing, found that some or all of Petitioner's alleged facts were *false*, then the

trial court's finding could not "reasonably be reconciled" with the limited record that was then

before it, resulting in violation of 28 U.S.C. § 2254(d)(2). (*See* November Order, at 13-19; *see*

*also Jones*, 694 F.3d at 235 & n.1.) Accordingly, for the reasons stated in the Court's November

Order, this Court made a preliminary determination that Petitioner had demonstrated a violation

of Section 2254(d).

      That determination, however, did not resolve the underlying issue of Petitioner's

entitlement to habeas relief, as the record before the trial court was too limited to enable this

Court to ascertain whether Petitioner had, in fact, received ineffective assistance of counsel and

was thus being held "in custody in violation of the Constitution . . . of the United States."

28 U.S.C. § 2254(a). As the lack of factual development was not due to any fault of Petitioner's,

but rather to the failure of the state court to hold a hearing, it was permissible for this Court to

hold the necessary evidentiary hearing to make credibility determinations and to resolve any

conflicts in the evidence, *see Williams v. Taylor*, 529 U.S. 420, 429 (2000) ("*Michael*

*Williams*"); *cf.* 28 U.S.C. § 2254(e)(2), and this Court held such a hearing on January 22, 2014.

**b.** **Findings of Fact, Based on the Evidence Before This Court**

At the evidentiary hearing before this Court, Petitioner generally testified credibly, in a manner that was materially consistent with the affidavit he had submitted in connection with his Section 440.10 motion. Iannuzzi also testified credibly, but his testimony tended more to corroborate Petitioner's account of the facts than to refute it, and new documentary evidence submitted by Respondent also tended to support Petitioner's version of events. After considering all of the presented evidence, as well as the demeanor of the witnesses, this Court makes the following findings of fact:

**i.** **Plea Offer**

*First, this Court finds that the prosecution initially extended to Petitioner, through Iannuzzi, an offer of a sentence of 20 years to life, and then, shortly before trial, an offer of 18 years to life, in exchange for Petitioner's plea of guilty to murder in the second degree.*

This Court's finding that an 18-to-life plea offer was eventually extended to Petitioner, before trial, is supported by Petitioner's testimony, which was not only unrefuted by any witness with knowledge, but which was largely corroborated by both the minutes of pre-trial proceedings and the trial judge's own notes.

When Petitioner first attested to having received a plea offer of 18 years to life (*see* Pet. Aff. ¶ 8), both the prosecutor and Petitioner's own trial counsel denied any recollection of this or, indeed, of *any* plea discussions. The lead prosecutor, McCarthy, stated by affidavit that he did not recall "extending any plea offer" to Petitioner (McCarthy Aff. ¶ 2), and Petitioner's trial counsel, Iannuzzi, stated by affidavit that he neither recalled having any conversations with the prosecution about a plea offer, nor conveying to Petitioner an offer of either 20 years to life or 18 years to life (Iannuzzi Aff. ¶ 5). As noted above, however, Petitioner submitted to the trial court

a transcript of a pre-trial calendar call reflecting that, according to one of McCarthy's colleagues, "offers" in the case "ha[d] been made." (12/3/01 Tr., at 2.) More importantly, additional evidence obtained by habeas counsel, prior to the hearing in this Court, confirmed that the prosecution had in fact extended an offer to Petitioner – eliminating any doubt as to whether the "offers" referred to in the pre-trial transcript might have been made only to Petitioner's co-defendants.

Specifically, at the hearing before this Court, the parties stipulated that, if called to testify, the trial judge would state that he took notes regarding Petitioner's case, that he retained those notes, and that, according to those notes, a plea offer of "Murder 2 with 20 to life" had been extended to Petitioner, with the possibility of "18 or 19 to life." (Habeas Hr'g Tr., at 2-3; Court Ex. 1 (Dkt. 30).) In addition, the parties introduced previously missing pages of the state court transcript, which included colloquy on the record among Iannuzzi, McCarthy, and the court, confirming that, as of about two weeks before Petitioner's trial, the prosecution had made Petitioner a plea offer, but that the offer was not acceptable to Petitioner.[6] (*See* Habeas Hr'g Tr., at 4-5; Court Ex. 2, at 38-39.) According to this transcript, Iannuzzi stated to the Court that he was "sure" that, "over the weekend," McCarthy would "reconsider" the prosecution's position. (*See* Habeas Hr'g Tr., at 7-8; Court Ex. 2, at 39.) Taking this evidence together, it is fully

---

[6] In his post-hearing brief, Petitioner indicates that the date when this colloquy took place was January 3, 2002 (Petitioner's Post-Hearing Letter Brief, dated Feb. 14, 2014 ("Pet. Ltr. Br.") (Dkt. 25), at 6), but Respondent's counsel represented that it took place on the last day of the pre-trial hearing (*see* Habeas Hr'g Tr., at 5), which was January 4, 2002 (*see* R. at 213). The one-day discrepancy would not alter this Court's analysis of Petitioner's claim, as in either case, the exchange took place after Suarez pleaded guilty on January 2, 2002 (*see* Pet. Ltr. Br., at 6; State Court File Jacket ("File Jacket") (Dkt. 25-1) (showing the date of disposition on Suarez's guilty plea as "1-2-02"); Respondent's Post-Hearing Letter Brief, dated Feb. 13, 2014 ("Resp. Ltr. Br.") (Dkt. 26), at 3) and prior to the commencement of Petitioner's trial (*see* R. at 256).

consistent with the testimony given by Petitioner, in which he asserted that the prosecution had

first offered him a deal of 20 years to life and then, "[r]ight before trial," reduced the offer to 18

years to life. (Habeas Hr'g Tr., at 14; *see* Pet. Aff. ¶ 8.) Further, the fact that Petitioner

memorialized his account by affidavit, before learning of the judge's notes, speaks to the

trustworthiness of his account.

　　　While now forced to concede that "an offer was extended to [P]etitioner at some point"

(Resp. Ltr. Br., at 2), Respondent nonetheless argues that the details of the offer are insufficiently

established and that, for various reasons, Petitioner should not be considered credible. Among

other things, Respondent points out that the trial judge's notes also reflect that Petitioner, for his

part, was seeking a plea with a sentence of 15 years to life, which conflicts with Petitioner's

testimony that, to his understanding, Iannuzzi was trying to negotiate a determinate sentence for

him of a "flat" 15 years. (Resp. Ltr. Br., at 3; *see also* Habeas Hr'g Tr., at 26-27.) The similarity

of the accounts strikes this Court as more remarkable than their differences. Prior to the hearing,

Petitioner was the only person to state affirmatively that Iannuzzi had sought to negotiate any

plea deal on his behalf, let alone to specify a desired 15-year term. (*See* Pet. Aff. ¶ 8.) Whether

Iannuzzi was trying to negotiate a determinate 15-year sentence, as Petitioner seems to have

believed, or an indeterminate sentence of 15 years to life, as the judge's notes suggest, does not

affect this Court's assessment of Petitioner's credibility on the key question of what offer was

actually extended to him. Although Respondent is correct that no documentary evidence

precisely confirms that the prosecution eventually offered Petitioner a plea deal of 18 years to

life (which was only reflected as a possible future offer in the trial judge's notes) (*see* Resp. Ltr.

Br., at 3), the Court nevertheless finds Petitioner's testimony on this point to be both genuine and

generally consistent with the trial court's notes and the comments made by the parties on the record, and accepts it as fully credible.

As to the other terms of the plea offer, Petitioner testified that, had he accepted the plea offer, he would have pleaded guilty to murder in the second degree, and that, as he understood it, there were no other material terms of the bargain.  (*See* Habeas Hr'g Tr., at 17.)  Again, the trial judge's notes support Petitioner's testimony, as they included a notation that the initial offer was for a plea to "Murder 2," and the notes did not reference any other terms.  (*See* Court Ex. 1.) Based on the structure of the New York Penal Law, it would have made sense for a deal of 18 years to life to have been based on a plea to second-degree murder, given that such a sentence would not have satisfied the minimum sentencing requirement for first-degree murder.  *See* N.Y. Pen. L. § 70.00(3)(a)(i) (eff. until July 22, 2004) (dictating minimum prison term for first-degree murder to be "not less than twenty years" and minimum term for other class A-I felonies, such as second-degree murder, to be "not . . . less than fifteen years").[7]  Finally, the fact that second-degree murder would have been among the most serious offenses to which Petitioner could have pleaded guilty, and thus not necessarily in his self-interest, buttresses Petitioner's credibility on this point, especially where Petitioner knew that his co-defendant Suarez had pleaded guilty to the lesser crime of robbery.

---

[7] For both first- and second-degree murder, the statutory maximum term of the sentence would have been life imprisonment, but life without parole could only have been imposed for murder in the first degree.  *See* N.Y. Pen. L. §§ 70.00(2)(a), (5); 125.25; 125.27.

## ii.   Erroneous Advice by Counsel

*Second, this Court finds that Petitioner's counsel informed him, erroneously, that the maximum sentence he could face, if convicted, would be 25 years to life in prison (as opposed to life without parole).*

As in the affidavit he submitted to the trial court on his Section 440.10 motion, Petitioner testified before this Court that, based on his own research, he had told Iannuzzi that he thought he could receive a sentence of "natural life" on a charge of first-degree murder, but Iannuzzi had informed him that he was wrong, and that the maximum sentence he could receive after trial was instead 25 years to life. (*See* Habeas Hr'g Tr., at 12-13, 21.) This testimony by Petitioner became entirely believable after Iannuzzi took the stand and testified to his own recollection of events.

Iannuzzi's testimony on the stand was somewhat confused and disjointed, but, considered in its entirety, it painted a picture of the circumstances in which he came to offer incorrect advice to Petitioner. As background, this Court takes judicial notice of the fact that, in 1995, the New York state legislature made certain amendments to the state penal, criminal procedure, and related laws, including, *inter alia*, expanding the definition of first-degree murder to include an intentional killing committed during any of certain enumerated felonies, allowing for a sentence of life imprisonment without parole upon conviction for first-degree murder, and restoring the death penalty as a sentencing option. *See* 1995 Sess. Law News of N.Y. Ch. 1 (S. 2850, A. 4843) (McKinney's). Iannuzzi testified that, at the time that these statutes were amended, he attended a training program relating to the amendments, but the program covered, as he described it, "[m]ostly death." (Habeas Hr'g Tr., at 60; *see also id.* ("It was concentrated on death and the handling of actual death cases.").) According to Iannuzzi, the aspect of the

31

amendment that allowed for a sentence of life imprisonment without parole was "not really" dealt with at the training he attended. (*Id.*) Rather, he testified that "[t]he course was dealing mainly with death. They didn't deal very much with cases where death wasn't involved." (*Id.*)

Iannuzzi recalled that Petitioner's case, which commenced in 2000, "was being handled as murder 1 until such time as the district attorney determined that it was not to be a death penalty" case (*id.* at 65), and that "once [he] got a determination from the District Attorney's office that murder 1 was not in the picture" (*id.*), he "thereafter . . . more or less  handled [the case] as if it were a murder 2" (*id.*). Indeed, from the totality of Iannuzzi's testimony, it appears that, in the wake of the restoration of the death penalty, he largely equated first-degree murder with capital murder. In this context, Iannuzzi testified that, while he could not recall any specific conversations that he had with Petitioner, he was "sure" that he "would have told [Petitioner]" that the maximum sentence he faced was 25 years to life in prison (*id.* at 64) – *i.e.*, the maximum sentence that was then available for second-degree murder, *see* N.Y. Pen. L. § 70.00(3)(i) (eff. until July 22, 2004), *not* first-degree murder, for which Petitioner was still being prosecuted.

While Respondent argues that Iannuzzi was an experienced criminal defense lawyer who would not have been likely to make such a mistake (*see* Resp. Ltr. Br., at 8), and attempts to cast his testimony as that of a zealous advocate "falling on his sword" for Petitioner (*id.* at 8-9), Iannuzzi testified that he had not tried a first-degree murder case since well before the 1995 amendments (*see* Habeas Hr'g Tr., at 59 (testifying that he had tried such a case in 1964 and 1965)). It appears that, between the date of the statutory amendments in 1995 and Petitioner's case in 2000, Iannuzzi had not represented any client who had been charged with first-degree murder and who had therefore faced a potential sentence of life without parole. It is thus entirely credible that such a sentence would not have been part of Iannuzzi's usual frame of reference for

32

homicide cases.  In fact, Iannuzzi confirmed that he "wasn't focusing on" the possibility that

Petitioner would receive a sentence of life without parole until the jury reached its verdict.  (*Id.*

at 68.)  Iannuzzi testified credibly that it was only at or after that point that the sentence "became

something [he] focused on more," when "suddenly [he] had to deal with life without parole."

(*Id.*)  Given this testimony, it seems that Petitioner's potential sentence of life imprisonment

without parole caught Iannuzzi by surprise.

In the hearing conducted by this Court, Respondent's counsel asked Iannuzzi directly

whether he would have told Petitioner that the maximum sentence he could face upon conviction

was 25 years to life imprisonment, when Petitioner's maximum sentencing exposure was

actually life without parole.  In response, Iannuzzi testified:  "It would be hard for me to tell him

that he would be facing 25 to life if he was facing life without parole unless it was something

that I didn't discuss with him until later in the case, after the verdict came in and then we had to

deal with the possibility at that point."  (*Id.* at 69.)  Taking Iannuzzi's hearing testimony as a

whole, this Court finds that, once the prosecution decided not to pursue the death penalty,

Iannuzzi began to think of the case as a second-degree murder case, informed Petitioner

accordingly that his maximum sentence was 25 years to life, and failed to realize – let alone to

communicate to Petitioner – that Petitioner was actually facing a sentence of life without parole

until after he was convicted.

### iii.    Likelihood That Petitioner Would Have Accepted the Plea Offer and That It Would Have Been Presented to the Court

*Third, this Court finds that there is a reasonable probability that, if not for counsel's*

*erroneous advice, Petitioner would have accepted the plea offer of 18 years to life, that the*

*prosecution would not have withdrawn the offer, and that it would have been presented to the trial court.*

As in his earlier affidavit, Petitioner testified before this Court that Iannuzzi had discouraged him from taking the plea offer that was extended because it was not substantially different from the maximum sentence that Iannuzzi believed Petitioner would face if convicted. (*See* Habeas Hr'g Tr., at 15 ("Right before trial when we started saying that we were about to select our jury, I was telling him, what about the offer, you know. And he had told me, 18 years to life, 25 years to life, what's the difference.").) The Court credits this testimony, especially in light of Iannuzzi's evident confidence, at the time of trial, in the strength of Petitioner's defense. (*See id.* at 71 (Iannuzzi testifying that, as Petitioner was intoxicated at the time of the crime, "[h]e couldn't possibly have had intent [to commit the crime]").) If Iannuzzi thought that Petitioner had a strong defense that could be presented to a jury, and that the plea deal did not provide Petitioner with a significant benefit over the sentence that he would face if convicted at trial, then Iannuzzi might well have thought that accepting the plea would not have been in Petitioner's best interest.[8] Even so, though, Petitioner testified that he *did* seriously consider accepting the 18-years-to-life offer, because he was "a little nervous." (*Id.* at 13.) He also testified that he had no doubt that he would have accepted the offer, had he known that he could be sentenced to life imprisonment without parole. (*Id.* at 15.)

---

[8] It seems likely that Iannuzzi thought that, if convicted and sentenced (whether based on a plea or a jury verdict), Petitioner would not readily be granted parole, such that any indeterminate sentence could effectively result in life imprisonment and, for that reason, would not be a favorable deal. (*See* Habeas Hr'g Tr., at 47 (Errol recounting that Iannuzzi had "expressed that he wanted to go to trial because any sentencing with life at the end of it would be considered life in prison . . .").)

Respondent argues that, as a sentence of 18 years to life would have been significantly more favorable than 25 years to life (as Petitioner acknowledged in the hearing before this Court (*see id.* at 26)), Petitioner should have been interested in the plea offer even if he had believed that 25 years to life was the maximum sentence he faced at trial (Resp. Ltr. Br., at 5); from this, Respondent suggests that the fact that Petitioner rejected the offer implies that he did not want a plea deal at all, but rather an acquittal (*id.*). The Court notes the inherent difficulty of discerning between what someone would do differently now, with perfect hindsight, and what someone would have done at the time, with competent legal advice, but no certainty as to the eventual outcome of the trial. Nonetheless, this Court is persuaded that Petitioner was, in fact, interested in a plea; that he followed his attorney's advice that the plea offer was not favorable, given Petitioner's available defenses and his supposed maximum potential exposure at trial; and that, had Petitioner understood his actual sentencing exposure (an issue on which he had pressed Iannuzzi before trial), he would have made a different risk calculation.

Further, there is nothing in the record to suggest that, had Petitioner accepted the plea offer, the prosecution would have withdrawn it before trial. The record is clear that an offer to Petitioner remained on the table on January 4, 2002 (*see* Court Ex. 2), less than two weeks before his trial was to commence (*see* R. at 256). Even Suarez's agreement, two days earlier, to plead guilty and cooperate as a prosecution witness against Petitioner had not caused the prosecution to withdraw the offer to Petitioner. (*See* File Jacket.) Given that, as of January 4, 2002, the prosecutor was still keeping the trial court apprised of the status of plea negotiations with Iannuzzi, the record gives every indication that any plea offer accepted by Petitioner would have been presented by the prosecution to the court.

35

        **iv.**      **Likelihood That the Trial Court Would**
                        **Have Accepted the Offer's Terms and**
                        **Imposed a Sentence Less Severe Than**
                        <u>**the Sentence Petitioner Ultimately Received**</u>

*Fourth, this Court finds that there is a reasonable probability that the state court would have accepted the terms of the plea offer, had it been presented to the court, and that Petitioner would have then received a less severe sentence than the one he received after trial.*

Absolutely nothing in the record suggests that the trial court would not have accepted a guilty plea by Petitioner to second-degree murder, with an agreed sentence of 18 years to life. The trial judge specifically stated, at a pre-trial calendar call: "The case can always be disposed of if that's what the attorneys and their clients and the People wish to do." (12/3/01 Tr., at 6.) Moreover, before the prosecution extended its final plea offer to Petitioner, the trial judge made note of the prosecution's extant offer of 20 years to life, as well as the possibility that the prosecution would, in the future, offer a deal of 18 or 19 years to life, without giving any indication that such a potential future offer would be unacceptable. (*See* Court Ex. 1.)

Neither party contends that the judge disapproved, at any time, of any offer of which the court was made aware. In fact, Suarez – the only one of Petitioner's co-defendants to accept a plea offer – pleaded guilty to a lesser charge of robbery in the first degree and received a shorter sentence of 14 years in prison. (*See* File Jacket.) The notations in the court file suggest that those terms, which were less severe than the terms offered to Petitioner, both as to the crime and as to the sentence, were accepted by the trial court. (*See id.*) It thus appears reasonably probable that the trial court would have similarly accepted the terms of Petitioner's plea bargain and sentenced him, accordingly, to a prison term of 18 years to life, a sentence that is obviously less severe than the sentence of life without parole that Petitioner received after his conviction at trial.

36

c.   **Conclusions of Law as to Whether Habeas Writ Should Issue**

This Court has already reasoned that, by rejecting Petitioner's ineffective-assistance-of-counsel claim without a hearing, the state court either (1) unreasonably applied *Strickland* to Petitioner's claim, or (2) made an unreasonable determination of the facts in light of the record before it. (*See generally* November Order; 28 U.S.C. § 2254(d)(1), (2).)  Under these circumstances, "no deference is due" to the state court's decision, under AEDPA. *Panetti*, 551 U.S. at 948.  Rather, the Court must determine, *de novo*, whether Petitioner is in fact being held "in custody in violation of the Constitution or laws or treaties of the Unites States." 28 U.S.C. § 2254(a).

While there is no constitutional right to a plea bargain, *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977), there is a constitutional right to the effective assistance of counsel at the plea-bargaining stage, *see Missouri v. Frye*, 132 S. Ct. 1399 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010); *Hill v. Lockhart*, 474 U.S. 52 (1985), and the *Strickland* test generally applies to ineffective assistance claims arising out of that stage, *see Cooper*, 132 S. Ct. at 1384.

Under the first prong of the *Strickland* test, an attorney has "a professional obligation to adequately inform [his] client about the considerations that are relevant to [his] client's decision to accept or deny a plea bargain," *Davis v. Greiner*, 428 F.3d 81, 88 (2d Cir. 2005), which means that "counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed," *Purdy v. United States*, 208 F.3d 41, 44 (2d Cir. 2000) (internal citation omitted).  "[G]rossly underestimating [the defendant's] sentencing exposure" constitutes a breach of an attorney's duty "to advise his client fully on whether a particular plea to a charge appears desirable." *U.S. v. Gordon*, 156 F.3d 376, 380 (2d

37

Cir. 1998) (internal citations omitted).  Thus, in *Gordon*, where the attorney erroneously advised his client that he faced a maximum of 120 months incarceration if convicted, when in fact he faced a sentencing range from 210 to 262 months, the attorney's conduct was found to fall "below an objective standard of reasonableness." *Id.*

To establish the "prejudice" necessary to satisfy the second prong of *Strickland*, a petitioner must also demonstrate that "the outcome of the plea process would have been different with competent advice." *Cooper*, 132 S. Ct. at 1384.  Specifically, a petitioner who chose not to accept a plea offer must show that, "but for the ineffective advice of counsel[,] there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the [petitioner] would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* at 1385.

Here, as set out above, this Court has found that Iannuzzi misrepresented Petitioner's maximum sentencing exposure as 25 years to life in prison, when, in fact, Petitioner faced a maximum potential sentence of life imprisonment without parole.  This is sufficient to satisfy *Strickland*'s requirement that counsel's performance in advising Petitioner during plea negotiations "fell below an objective standard of reasonableness" in light of prevailing professional norms. *Strickland*, 466 U.S. at 688; *see Gordon*, 156 F.3d at 380.

Moreover, this Court has found that, had Petitioner been given correct information by his counsel, he would have accepted an offer by the prosecution to plead guilty to second-degree murder and serve a sentence of 18 years to life in prison, the prosecution would not have withdrawn the offer, and the trial court would likely have accepted the parties' plea deal and

38

sentenced Petitioner in accordance with its terms.  Under these circumstances, Petitioner has also

met his burden, under *Strickland*, to demonstrate prejudice from Iannuzzi's deficient advice.  A

conviction for murder in the second degree, by way of a plea, would have been inherently less

severe than a conviction for murder in the first degree.  *See, e.g., People v. Granger*, 187 N.Y.

67, 73 (1907) (referring to murder in the first degree as a "greater offense" than murder in the

second degree).  More significantly, a prison sentence of 18 years to life would have been, on its

face, much less severe than the sentence that Petitioner received after trial – life imprisonment

without the possibility of parole.  *See Solem v. Helm*, 463 U.S. 277, 297 (1983) (referring to life

imprisonment without possibility of parole as "far more severe" than a life sentence with the

possibility of parole); *Graham v. Florida*, 560 U.S. 48, 69-70 (2010) (referring to life

imprisonment without parole as "the second most severe penalty permitted by law," after the

death penalty).

  This Court concludes that Petitioner was deprived of the effective assistance of counsel

during plea negotiations, in violation of the Sixth Amendment, *see Cooper*, 132 S. Ct. at 1384,

and that federal habeas relief should therefore be granted.  As noted by the Supreme Court in

*Cooper*, the proper remedy in these circumstances is to direct the prosecution to re-extend its

final plea offer to Petitioner (*i.e.*, its offer to agree to a prison sentence of 18 years to life, in

exchange for Petitioner's plea of guilty to murder in the second degree), and, assuming Petitioner

accepts it, to present the plea deal to the state trial court. *See Cooper*, 132 S. Ct. at 1391; *see

also* Resp. Ltr. Br., at 10 n.2.  Accordingly, I recommend that a writ of habeas corpus be granted,

to that extent.

## **CONCLUSION**

For the foregoing reasons, Petitioner's application to stay these proceedings and hold

them in abeyance pending the exhaustion of his claims (*see* Dkt. 1) is hereby granted,

*nunc pro tunc* to the date of the Petition.

As to the resolution of Petitioner's habeas claims, I respectfully recommend that, with

respect to Petitioner's claim that he received ineffective assistance of counsel in connection with

a plea offer, the Court

    (1)    find that Petitioner has met the standards for relief set forth in 28 U.S.C.
            § 2254(d)(1) and/or (2);

    (2)    find that Petitioner has demonstrated that he was denied his Sixth Amendment
            right to the effective assistance of counsel, and that he is thus entitled to a writ of
            habeas corpus, pursuant to 28 U.S.C. § 2254(a); and

    (3)    grant Petitioner habeas relief accordingly, to the extent of directing the
            prosecution to re-extend the 18-years-to-life plea offer and to present any
            resulting plea deal to the state trial court.

I further recommend that the remaining claims pleaded in the Petition be dismissed.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report and

Recommendation to file written objections. *See also* Fed. R. Civ. P. 6 (adding three days for

service by mail). Such objections, and any responses to objections, shall be filed with the Clerk

of Court, with courtesy copies delivered to the chambers of the Honorable Lorna G. Schofield,

United States Courthouse, 40 Foley Square, Room 201, New York, New York 10007, and to the

chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New

York, New York 10007. Any requests for an extension of time for filing objections must be

directed to Judge Schofield. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14)

DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE

APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension*

*Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300

(2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*,

714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        August 14, 2014

                                        Respectfully submitted,

                                        DEBRA FREEMAN
                                        United States Magistrate Judge

Attachment:

Order, dated Nov. 13, 2013 (Dkt. 21)

Copies to:

Hon. Lorna G. Schofield, U.S.D.J.

All counsel (via ECF)

41

```
                                                    ┌─────────────────────────────┐
                                                    │ USDC SDNY                   │
UNITED STATES DISTRICT COURT                        │ DOCUMENT                    │
SOUTHERN DISTRICT OF NEW YORK                       │ ELECTRONICALLY FILED        │
-----------------------------------------------X    │ DOC #: _____        │
                                            :       │ DATE FILED: _11/13/13_      │
DEVON MILLINGTON,                           :       └─────────────────────────────┘

                    Petitioner,             :       11 Civ. 00499 (LGS) (DF)

                                            :

        -against-                           :       **ORDER**

                                            :

WILLIAM LEE, Superintendent,
Green Haven Correctional Facility,          :

                    Respondent.             :
-----------------------------------------------X
```

**DEBRA FREEMAN, United States Magistrate Judge:**

Petitioner Devon Millington ("Petitioner"), who, as a result of his conviction by a jury for the crime of murder in the first degree, is currently serving a term of life in prison at the Green Haven Correctional Facility in Stormville, New York, challenges his conviction and sentence in a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  The case has been referred to the undersigned for a report and recommendation, but, for the reasons discussed below, this Court has determined that it must hold an evidentiary hearing prior to issuing proposed findings of fact and any recommendation as to the proper disposition of Petitioner's claims.  In particular, this Court finds that an evidentiary hearing is needed to resolve factual disputes underlying Petitioner's claim that, in the context of discouraging Petitioner from accepting a plea bargain offered by the State, Petitioner's trial counsel rendered ineffective assistance by misinforming Petitioner that the maximum prison sentence he could face, if convicted, was an indeterminate sentence of 25 years to life, when Petitioner actually faced a maximum sentence of life imprisonment without parole.

## BACKGROUND

### A.    Petitioner's Indictment

Based on the evidence presented at trial, Petitioner killed Everad "Eric" Gerrald ("Gerrald") during the course of a robbery that Petitioner committed with Michael Suarez ("Suarez") and Anthony Stallings ("Stallings"). (*See generally* Record on Appeal ("R.") (Dkt. 10), at 256[1] (Transcript of Trial, conducted Jan. 15, 2002 through Jan. 28, 2002).) The details of the crime itself are not relevant to this Order.

The police arrested Petitioner during the early morning hours of October 7, 2000. (R., at 918:23-926:19.) The next day, Petitioner gave a statement after being informed of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). (*See id.*, at 929:1-930:18.) In the statement, Petitioner admitted that, although it had been Suarez's idea to rob Gerrald, Petitioner had committed the murder (*see* R., at 1639-41 (People's Exhibit 24 (Written Statement of Devon Millington), dated Oct. 7, 2000)). Petitioner subsequently also gave a videotaped confession. (*See* R., at 1050:16-1052:21, 1642-48 (People's Exhibit 25 (Transcript of Video Statement of Devon Millington)).) As part of the videotaped statement, Petitioner acknowledged that the written statement he had given earlier was his, and that he had signed an explanation of his rights. (*See id.*, at 1648.)

On October 12, 2000, a grand jury indicted Petitioner for first-degree murder and Petitioner, Stallings, and Suarez for second-degree murder and several other crimes. (*See* R., at 4-9 (Indictment, dated Oct. 12, 2000).)

---

[1] The page numbers to the Record on Appeal, as referenced herein, are to the document control numbers stamped at the bottom of each page of the Record.

### B.      Alleged Plea Offers and Erroneous Advice of Counsel

Petitioner's father, Roy Millington ("Roy"), retained John Nicholas Iannuzzi, Esq.

("Iannuzzi") as Petitioner's defense counsel.  (Declaration in Opposition to Petition for a Writ of

Habeas Corpus, dated June 2011 ("Kamlet Decl.") (Dkt. 9), Ex. 17 (Affidavit of Roy Millington,

sworn to Sept. 14, 2009 ("Roy Aff.")), ¶ 1.)

According to Petitioner, Iannuzzi told him, in the course of his representation, that the

maximum sentence Petitioner would face if convicted was 25 years to life in prison.  (*See* Letter

from Bari L. Kamlet, dated July 26, 2011 ("Kamlet Ltr."), Ex. 3 (Petitioner's Affidavit, sworn to

Sept. 15, 2009 ("Pet. Aff.")), ¶ 8.)  Petitioner also asserts that, at some point, Iannuzzi told him

that he was attempting to negotiate a 15-year sentence for Petitioner under a plea deal, but that

the prosecutor was only offering 20 years to life.  (*Id.*)  Petitioner further maintains that, "[j]ust

before trial," the prosecutor offered a plea deal of 18 years to life, but Iannuzzi "discouraged"

Petitioner from accepting that deal, and also discouraged Petitioner's parents from advising him

to plead guilty, telling Petitioner:  "'18 to life, 25 to life, what's the difference?'"  (*Id.*)

After conducting his own legal research, Petitioner allegedly told Iannuzzi that he

believed the statute allowed for "natural life," but, according to Petitioner, Iannuzzi insisted that

25 years to life was the maximum.  (*Id.*)  Petitioner claims that he "followed Iannuzzi's advice"

not to accept the plea deal "because [he] thought [Iannuzzi] knew best."  (*Id.*)

### C.      Petitioner's Trial, Conviction, and Direct Appeal

Petitioner was eventually tried, separately from his co-defendants, in January, 2002.  (*See*

R., at 256.)  On January 28, 2002, the jury found Petitioner guilty of murder in the first degree

(*see* R., at 1632:1-13), and, on April 2, 2002, the trial court sentenced him to life imprisonment

without parole (*see* R., at 1685 (Sentencing Transcript)).

Petitioner, still represented by Iannuzzi, appealed to the Appellate Division in October 2006, raising several claims not relevant here. (*See* Kamlet Decl., Ex. 1.)  The Appellate Division denied the appeal on February 22, 2007, *see People v. Millington*, 830 N.Y.S.2d 143 (1st Dep't 2007), and, on June 14, 2007, the Court of Appeals denied Petitioner leave to appeal from the Appellate Division's decision, *see People v. Millington*, 9 N.Y.3d 848 (2007).

**D.    Collateral Post-Conviction Proceedings**

Petitioner retained Andrea Hirsch, Esq. ("Hirsch") for the purpose of pursuing additional post-conviction relief. (*See* Kamlet Ltr., Ex. 5 (Letter from Hirsch to Iannuzzi, dated Apr. 4, 2008).)  Through Hirsch, Petitioner filed a *coram nobis* petition in the Appellate Division, as well as certain motions for collateral relief in the trial court.  Of particular relevance here is the October 15, 2009 motion filed by Petitioner in the trial court under Section 440.10 of the New York Criminal Procedure Law, challenging the effectiveness of his trial counsel. (*See* Kamlet Decl., Ex. 5 (Notice of Motion to Vacate Judgment and Set Aside Sentence, dated Oct. 15, 2009; Affirmation of Andrea G. Hirsch, Esq., dated Oct. 15, 2009; Memorandum of Law, dated Oct. 15, 2009) ("Pet. § 440.10 Mem.").)  On that motion, Petitioner argued, *inter alia*, that Iannuzzi's representation was constitutionally defective because, in the context of advising Petitioner regarding a plea offer, Iannuzzi misrepresented to Petitioner the maximum sentence he could face if convicted of first-degree murder. (*See* Pet. § 440.10 Mem., at 19-20.)[2]

---

[2] Petitioner's state *coram nobis* petition raised a related argument – that Iannuzzi had provided ineffective assistance on appeal by raising baseless claims, while neglecting to raise the "strong argument" that he, himself, had deprived Petitioner of effective assistance of counsel in proceedings before the trial court. (*See* Kamlet Decl. ¶ 9 & Ex. 18 (Corrected Motion for a Writ of Error *Coram Nobis*; Affirmation of Andrea G. Hirsch, Esq., dated Oct. 28, 2008; and Memorandum of Law, dated Oct. 28, 2008 ("Coram Nobis Mem."), at 7-13).)  On May 7, 2009, the Appellate Division summarily denied Petitioner's motion for a writ of error *coram nobis* (*see*

4

In connection with this Section 440.10 motion, both Petitioner and Respondent submitted affidavits and letters to support their positions. (*See* Kamlet Ltr., Ex. 3-5, 9, 21-23.) Petitioner also submitted several transcripts of pretrial proceedings. (*See* Kamlet Ltr., Ex. 21.) Although Petitioner requested an evidentiary hearing so that the trial court could make credibility determinations and findings of fact (*see* Pet. § 440.10 Mem., at 11), the court denied Petitioner's Section 440.10 motion in its entirety without holding a hearing (Kamlet Decl., Ex. 6 ("11/22/10 Opinion"), at 4).

After reviewing the procedural history of the case, the court concluded its decision with the following brief analysis of Petitioner's ineffective-assistance-of-counsel claim:

> Taking all the evidence before this Court into consideration, the Court finds no basis to conclude that trial counsel's representation of the defendant was ineffective. Applying the standard enunciated in *People v. Baldi* (54 N.Y.2d 137 [1981]), this Court concludes: 1) despite the overwhelming evidence of guilt, Mr. Ianuzzi [sic] presented a well grounded defense; and 2) that Mr. Ianuzzi [sic] exhibited 'reasonable competence' in his representation of the defendant. As stated in *Baldi*, '[a]n attorney who presents a well grounded but unsuccessful defense will not be held to have provided ineffective assistance of counsel, and thus a defendant will not be entitled to a vacatur of his conviction on such basis.'

(*Id.*)[3] Nowhere in its decision did the trial court specifically address how it resolved Petitioner's and the State's contradictory allegations regarding plea discussions and Iannuzzi's conduct in that context.

---

Kamlet Decl., Ex. 3), and the Court of Appeals denied leave to appeal on October 30, 2009, *People v. Millington*, 13 N.Y.3d 837 (2009).

[3] A New York court "adjudicates a federal ineffective-assistance claim on the merits if it applies or simply cites *Baldi*," *Watkins v. Perez*, 2007 WL 1344168, at *8 (S.D.N.Y. May 7, 2007) (internal quotation marks and citations omitted), which tracks *Strickland* [*v. Washington*, 466 U.S. 668 (1984)] at the first prong but departs at the second prong with a standard of

On January 6, 2011, Petitioner sought leave to appeal to the Appellate Division. (*See* Kamlet Decl., Ex. 7.)  The Appellate Division summarily denied that application on April 14, 2011. (*See* Kamlet Decl., Ex. 8.)

### E.     Federal Habeas Petition

Proceeding *pro se*, Petitioner initiated the instant habeas proceeding on January 18, 2011.[4]  (*See* Petition, dated Jan. 18, 2011 ("Pet.") (Dkt. 1).)  In his papers, Petitioner noted that Hirsch had prepared his habeas Petition and requested that the Court appoint her to represent him.  (*See* Pet. ¶ 13.)

Although Petitioner raised a number of claims in his Petition, only one is relevant to this Order – Petitioner's claim (as previously raised in his Section 440.10 motion) that Iannuzzi's representation of Petitioner in connection with plea discussions was constitutionally ineffective because of Iannuzzi's purported failure "to tell [Petitioner] what sentences he faced; to advise [Petitioner] about the strengths and weaknesses of the prosecution's case; [and] to encourage him to accept the plea offer."  (Pet. ¶¶ 15, 17.)

On June 20, 2011, Respondent filed an opposition to the Petition (*see* Memorandum of Law, dated June 2011 (Dkt. 9) (attached to Kamlet Decl.)), arguing, *inter alia*, that no plea was ever offered to Petitioner (*id.*, at 18-21).

---

prejudice "somewhat more favorable to defendants," *Rosario v. Ercole*, 601 F.3d 118, 124 (2d Cir. 2010) (quoting *People v. Turner*, 5 N.Y.3d 476 (N.Y. 2005) (collecting cases)); *see also* discussion of the federal *Strickland* standard, *infra*.

[4] Although the Court's docket reflects a filing date of January 21, 2011 for the Petition (Dkt. 1), a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the Court. *See Houston v. Lack*, 487 U.S. 266, 270 (1988). Thus, in the absence of evidence to the contrary, the Court will deem the Petition to have been filed on January 18, 2011, the date Petitioner signed it. *See, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

After that, on July 4, 2011, Hirsch filed a Notice of Appearance in this Court, stating that she had "been retained to represent [Petitioner] in all further proceedings in this case." (Dkt. 12.) Hirsch filed a reply on Petitioner's behalf on October 6, 2011. (*See* Petitioner's Reply to the State's Opposition Papers (Dkt. 15).)

## DISCUSSION

## I.    APPLICABLE LEGAL STANDARDS

### A.    Standard of Review

A petitioner who is in custody pursuant to a state court judgment may seek a federal writ of habeas corpus on the ground that his custody is in violation of federal law, *see* 28 U.S.C. § 2254(a), when he has exhausted all available state court remedies or is excused from doing so, *see* 28 U.S.C. § 2254(b)(1).  If the petitioner's claim has been adjudicated on the merits by the state court, then the federal court must accord substantial deference to the state court's decision under the standard of review dictated by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See* 28 U.S.C. § 2254(d).  The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.*  This standard of review is, by design, "difficult to meet." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

7

An "unreasonable application" of clearly established federal law under § 2254(d)(1) occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003). The state court's decision "must have been more than incorrect or erroneous"; it must have been "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (*Terry Williams*)). Review under Section 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). Evidence later introduced in federal court is irrelevant to this review. *Id.*

Further, under AEDPA, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), showing that the state court's factual determinations were "objectively unreasonable," *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A federal court may find a factual determination of the state court to have been unreasonable under this standard if the decision "cannot reasonably be reconciled" with the record that was before the state court. *Jones v. Murphy*, 694 F.3d 225, 235 (2d Cir. 2012).

Section 2254(e)(2) controls whether a petitioner may receive an evidentiary hearing in federal district court on claims that were not developed in the state courts. *See Williams v. Taylor*, 529 U.S. 420, 429 (2000) (*Michael Williams*). Section 2254(e)(2) provides that, "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim," with strictly limited exceptions. 28 U.S.C. § 2254(e)(2). A petitioner has *not* "failed to develop" the facts of his claim, and thus *may* receive a hearing without demonstrating that his case falls into the exceptions, "[i]f there has

8

been no lack of diligence at the relevant stages in the state proceedings." *See Michael Williams*, 529 U.S.C. at 437.

Reading *Michael Williams* and *Pinholster* together, a habeas petitioner may receive an evidentiary hearing to determine the merits of his petition in federal court if – and only if – he has been diligent in state court (or meets the exceptions) and can satisfy § 2254(d)(1) solely on the basis of the record that was before the state court. *See* 28 U.S.C. § 2254(e)(2); *Pinholster*, 131 S. Ct. at 1400 & n.5 (reconciling its holding with *Michael Williams*). As explained in detail below, that is precisely the posture of Petitioner's case.

**B.    <u>Ineffective Assistance of Counsel</u>**

For purposes of review under AEDPA, *Strickland v. Washington*, 466 U.S. 668 (1984) sets out the relevant "clearly established federal law" for ineffective-assistance-of-counsel claims. *See Aparicio v. Artuz*, 269 F.3d 78, 95 & n.8 (2d Cir. 2001) (noting that it is "beyond cavil" that *Strickland* is clearly established federal law). To prevail on a claim of ineffective assistance of counsel under *Strickland*, a petitioner must show that: (1) counsel's performance "fell below an objective standard of reasonableness" in light of prevailing professional norms, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A court may reject an ineffective-assistance-of-counsel claim for failure to satisfy either prong of the *Strickland* standard, without reaching the other. *See Strickland*, 466 U.S. at 697.

The Supreme Court has long held that a criminal defendant's Sixth Amendment right to counsel applies in the plea-bargaining phase as well as at trial, *see McMann v. Richardson*, 397 U.S. 759, 771 (1970), and that *Strickland* provides the relevant standard, *see Hill v. Lockhart*,

9

474 U.S. 52 (1985); *Padilla v. Kentucky*, 559 U.S. 356 (2010); *Missouri v. Frye*, 132 S. Ct. 1399 (2012).

In the context of plea negotiations, counsel must "communicate to the defendant the terms of any plea bargain." *Cullen v. U.S.*, 194 F.3d 401, 404 (2d Cir. 1999) (applying the first prong of the *Strickland* test). Further, "grossly underestimating [the defendant's] sentencing exposure" constitutes a breach of an attorney's duty "to advise his client fully on whether a particular plea to a charge appears desirable." *U.S. v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) (quoting *Boria v. Keane*, 99 F.3d 492, 496 (2d Cir. 1996) (applying *Strickland*)).

Prejudice in this context means that "the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012); *see also Hill*, 474 U.S. 52. Specifically, where a petitioner claims that deficient advice caused him to reject a favorable plea offer, the petitioner must show that,

> but for the ineffective advice of counsel[,] there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the [petitioner] would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Cooper*, 132 S. Ct. at 1385.

As "the standards created by *Strickland* and § 2254(d) are both highly deferential, . . . when the two apply in tandem, review is doubly so." *Richter*, 131 S. Ct. at 788 (internal quotation marks and citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

10

## II.     THE STATE COURT'S DETERMINATION OF PETITIONER'S CLAIM

Review in this case is complicated by the trial court's failure to make any explicit findings of fact regarding Iannuzzi's conduct in the plea context. (*See* 11/22/10 Opinion.) To the extent the court implicitly made findings on that subject, there are only two possible sets of findings that could have supported the court's legal conclusion that Iannuzzi "exhibited 'reasonable competence' in his representation of [Petitioner]." *Id.* First, the court could have accepted the truth of Petitioner's assertions regarding the existence of a plea offer and Iannuzzi's erroneous representation regarding the maximum sentence Petitioner could face, but nonetheless found Iannuzzi's conduct to have been constitutionally adequate. Second, the court could have rejected some or all of Petitioner's assertions as untrue.

If this Court were to assume that the state court *accepted* Petitioner's recitation of facts, then this Court would need to determine, under 28 U.S.C. §2254(d)(1) – and based solely on the record that was before the state court, *see Pinholster*, 131 S. Ct. at 1398 – whether the state court's resulting denial of Petitioner's claim constituted an unreasonable application of *Strickland*. On the other hand, if this Court were to assume that the state court *rejected* Petitioner's factual assertions, then this Court would need to determine, under 28 U.S.C. § 2254(d)(2), whether the state court's denial of Petitioner's claim was based on an unreasonable determination of the facts in light of the evidence before it. If, under each of these AEDPA provisions, this Court were to determine that the state court acted unreasonably under the applicable standards, then this Court would need to proceed to consider whether Petitioner is actually being held in custody unlawfully. *See* 28 U.S.C. § 2254(a).

11

A.    **State Court's Application of *Strickland***

In *Lafler v. Cooper*, 132 S. Ct. 1376 (2012), the Supreme Court addressed factual circumstances materially similar to those presented here. The petitioner in *Cooper* had rejected a plea offer on his attorney's deficient advice that he could not be convicted at trial; he was then convicted and received a harsher sentence than what had been offered under the plea deal. *Id.*, at 1383. The Supreme Court held that "[b]y failing to apply *Strickland* . . ., the state court's adjudication was contrary to clearly established federal law."[5] *Cooper*, 132 S. Ct., at 1390.

Here, Petitioner claims that the prosecution offered him a plea bargain that he would have accepted, had he known the maximum sentence that could be imposed at trial, but that, because his trial attorney advised him erroneously about his potential sentencing exposure, he elected to stand trial and received a harsher sentence. (*See* Pet. Aff. ¶ 8.)

If the trial court decided or assumed that these assertions by Petitioner were true, then the court could not reasonably have concluded that Iannuzzi's conduct during plea negotiations met "an objective standard of reasonableness" in light of prevailing professional norms. *Strickland*, 466 U.S. at 688. By "grossly underestimating" Petitioner's sentencing exposure, and indeed erroneously advising him that he could not be sentenced to life imprisonment without parole, counsel's representation fell below an objective standard of reasonableness. *See Gordon*, 156 F.3d at 380; *see also Davis v. Greiner*, 428 F.3d 81, 89 (2d Cir. 2005) (noting that potential

---

[5] Although *Cooper* was decided after the date of the state court decision at issue here, *Cooper* is still instructive, as it addressed a state court decision issued in 2005 (well before the decision being challenged by Petitioner here), and held that the state court's failure to apply *Strickland* to advice regarding the rejection of a plea offer was contrary to clearly established federal law, even at that time. *See Cooper*, 132 S. Ct. at 1383.

sentencing exposure is a "key consideration" in making an informed decision whether to plead guilty).

Moreover, if the state court decided or assumed that Petitioner's allegations were true, it could not reasonably have concluded that Petitioner suffered no prejudice as a result of his counsel's conduct. To be prejudiced by poor advice at the plea stage, a petitioner must show that he would have accepted a plea offer, that the prosecution would not have withdrawn the offer, that the court would have accepted the agreement, and that "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Cooper*, 132 S. Ct. at 1385. Petitioner asserted that he would have accepted the plea deal of 18 years to life that he claims was offered (a prison term that would have been substantially lower than the term of life imprisonment without parole he eventually received (*see* Pet. Aff. ¶ 8)), and nothing in the record suggests that the offer, if made by the State and accepted by Petitioner, would not have been presented to or accepted by the trial court.

As noted above, the state court concluded that it had "no basis" to find that Petitioner's trial counsel was ineffective, because Iannuzzi "exhibited 'reasonable competence' in his representation." (*See* 11/22/10 Opinion, at 4.) Yet, for the reasons discussed above, if the court assumed or decided that the facts were as Petitioner alleged, then this decision necessarily involved an unreasonable application of *Strickland*.

**B.      State Court's Determination of the Facts in Light of the Evidence Presented**

Of course, the trial court need not have accepted as true the facts asserted by Petitioner in his Section 440.10 motion. Alternatively, in concluding that Iannuzzi "exhibited 'reasonable competence,'" the court may have implicitly determined that Petitioner was not credible in his assertions (1) that a plea deal was offered; (2) that Iannuzzi improperly advised Petitioner about

13

his maximum sentencing exposure; and (3) that there was a reasonable probability that the plea

offer would have been presented to and accepted by the trial court, and that the sentence would

have been less severe than the one Petitioner actually received.  The state court, however, could

not have reasonably made such factual determinations on the record before it, without a hearing.

### 1.   <u>Whether a Plea Offer Was Made</u>

Petitioner submitted an affidavit to the trial court, in which he attested that a plea offer

had been extended to him.  Specifically, Petitioner stated:

> Iannuzzi talked about a plea bargain.  He said that he was trying to
> get me 15 years flat.  At that time, the DA's office was offering me
> 20 years to life.  Just before trial, they dropped it to 18 years to life.

(Pet. Aff. ¶ 8.)  While the trial court may have believed that Petitioner lacked credibility in this

regard, or may have rejected as hearsay Petitioner's statements as to what Iannuzzi had told

him,[6] the record before the trial court also contained the minutes of several pretrial calendar calls

(*see* Kamlet Ltr., Ex. 21), which provided independent, reliable evidence that plea negotiations

had taken place and that, prior to trial, some type of plea offer had in fact been made to

Petitioner.

First, the record reflected that, on July 10, 2001, at a calendar call for the case against

Petitioner and Stallings, Assistant District Attorney ("ADA") Christine Scaccia stated:  "I've

---

[6] The court also may have rejected, on either credibility or hearsay grounds, the
statements on this point made by Petitioner's brother, Errol Millington ("Errol"), and father,
Roy, both of whom submitted affidavits in support of Petitioner's Section 440.10 motion.  In his
affidavit, Errol stated that he was present at a meeting with his father and Iannuzzi, at which
Iannuzzi reported that Petitioner could get "18 years to life if he accepted a plea bargain."
(Kamlet Decl., Ex. 16 (Affidavit of Errol Millington, sworn to Aug. 26, 2009 ("Errol Aff.")), ¶
4.)  Petitioner's father, for his part, merely reported hearing from Petitioner that "he could get 18
years to life."  (Roy Aff. ¶ 3.)

14

also extended what the People's recommendations are as far as sentencing on any possible

disposition, and we've had some further discussion about what interest the defendants might

have." (*See* Kamlet Ltr., Ex. 21 (attached Transcript of Calendar Call, conducted July 10, 2001),

at 4:7-10.) ADA Scaccia further represented that "with respect to these two attorneys [Iannuzzi

for Petitioner and Oliver Smith for Stallings]," she could discuss "any details that may need to be

gone into" before the hearing date "for disposition purposes." (*Id.* at 5:13-16.) These statements

strongly suggested that plea negotiations were then occurring with both Petitioner and Stallings.

Second, the record showed that, at a November 19, 2001 calendar call, attorney

Kevin Faga, who apparently worked for Iannuzzi's law firm,[7] appeared on behalf of Petitioner.

(*See* Kamlet Ltr., Ex. 21 (attached Transcript of Calendar Call, conducted Nov. 19, 2001), at

2:4-5.) Faga told the judge that Petitioner was withdrawing a pending motion "based on the fact

that we are negotiating towards a disposition." (*Id.* at 2:25-3:2.) The prosecutor did not

disagree.

Finally, on December 3, 2001, ADA Jeffrey Rosenbaum informed the Court on the

record, on behalf of the State, that "[ADA] McCarthy says the offers have been made, to be

accepted or not," and that "if this case is going to trial, he will be ready to try this case on

January 2nd." (*See* Kamlet Ltr., Ex. 21 (attached Transcript of Calendar Call, conducted Dec. 3,

2001 ("12/3/01 Tr.")), at 2:22-24.) The plain implication of this representation by the prosecutor

(which suggested that there might be no reason to try the case at all) was that the State had made

plea offers to each of the co-defendants, including Petitioner.

---

[7] (*See* R., at 20 (Letter from Kevin B. Faga); Kamlet Ltr., Ex. 13 (including
correspondence to "Kevin Faga, Esq." at "Iannuzzi & Iannuzzi").)

Although, in opposition to Petitioner's Section 440.10 motion, ADA Bari Kamlet informed the trial court that the prosecution case file "contain[ed] no indication that any plea offer was ever extended to [Petitioner]" (Kamlet Decl., Ex. 14, ¶ 10), the State offered no evidence directly refuting its own December 3, 2001 statement on the record that "the offers have been made." In fact, ADA McCarthy submitted an affirmation stating only that he did not "recall extending any plea offer" to Petitioner. (Kamlet Decl., Ex. 10 (Affirmation of Daniel T. McCarthy ("McCarthy Aff.")), ¶ 2.) Similarly, in his own affirmation, Iannuzzi stated only that he could "not recall conversations with the People about a plea offer" or conveying any plea offer to Petitioner. (Kamlet Decl., Ex. 12 (Affirmation of John Nicholas Iannuzzi, dated Feb. 24, 2010 ("Iannuzzi Aff.")), ¶ 5.)

In sum, on his Section 440.10 motion, Petitioner asserted by affidavit that he had been offered a plea deal of 18 years to life imprisonment, and he also submitted transcripts of state court proceedings tending to confirm that a pretrial plea deal had, in fact, been offered to him. Although, in opposition to Petitioner's motion, the State represented that its file did not reflect a plea offer, this, coupled only with counsel's asserted lack of recollection, would not have been sufficient to enable the trial court to conclude, without a hearing, that no plea offer had been made. As any such conclusion "cannot reasonably be reconciled" with the record the court had before it, *see Jones*, 694 F.3d at 235 & n.1 (2d Cir. 2012), it would have constituted an "unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d)(2).

## 2. Whether Iannuzzi Gave Petitioner Erroneous Information About His Maximum Potential Sentence

In the affidavit he submitted to the trial court, Petitioner also stated that Iannuzzi failed to inform him properly of the "comparative sentence exposure between standing trial and accepting a plea offer" crucial to the decision to accept a plea deal, *Gordon*, 156 F.3d at 380. Petitioner stated that Iannuzzi explicitly told him that his maximum sentence would be 25 years to life and that Iannuzzi specifically denied that Petitioner could face a life sentence if convicted. (*See* Pet. Aff. ¶ 8.) By separate affidavit, Petitioner's brother, Errol, corroborated Petitioner's account, stating that he, too, had heard Iannuzzi tell Petitioner that "the maximum sentence [Petitioner] faced if he went to trial was 25 years to life." (Errol Aff. ¶ 4.)

In his own affidavit, Iannuzzi stated that he "was fully aware at the time [he] represented [Petitioner]" that Petitioner could face life in prison without parole, if convicted at trial. (Iannuzzi Aff. ¶ 2.) In his affidavit, Iannuzzi also indicated that he did "not have a recollection of specific conversations that [he] had with [Petitioner]" (*id.* ¶ 3), but he went on to assert: "My general practice is to advise my clients as to what the law provides with regard to sentencing" (*id.* ¶ 4). Iannuzzi made no statement, though, as to what his general practice *was* at the time he represented Petitioner. As to whether he had discouraged Petitioner from accepting a plea offer, Iannuzzi stated only that he had "no current recollection" of ever doing so. (*Id.* ¶ 6.)

Based on this record, it also would have been unreasonable for the state court to conclude, without a hearing, that Iannuzzi's statements as to his general practice – and his statements about his lack of recollection – conclusively disproved Petitioner's and his brother's specific recollections as to what occurred in this case. *See Garcia v. Portuondo*, 104 F. App'x 776, 779-80 (2d Cir. 2004) (finding that state court's refusal to hold a hearing resulted in a

17

decision that was an "unreasonable determination of the facts in light of the evidence, where prosecutor and trial counsel had submitted affirmations denying petitioner's allegations that counsel had "grossly underestimat[ed]" his sentencing exposure); *see also Montes de Oca*, 2007 WL 4591991 at *6-7, *14-15 (S.D.N.Y. Dec. 27, 2007) (noting that a record containing conflicting affidavits was inadequate to resolve factual disputes); *see also Carrion v. Smith*, 365 F. App'x 278, 283 (2d Cir. 2010) (after evidentiary hearing, crediting petitioner's specific testimony over counsel's repeated testimony of general practice).

### 3.    <u>Whether Petitioner Was Prejudiced</u>

Nothing in the record tended to suggest that a plea offer, if made, would not have been presented to the trial court.  Petitioner asserted that, if properly advised about his maximum sentencing exposure at trial, he would have accepted a plea offer of 18 years to life in prison. (*See* Pet. Aff. ¶ 8.)  As the prosecutor denied recollection of extending any offer, his affirmation is silent on the question of whether any such offer would have been withdrawn without being presented to the court.  (*See* McCarthy Aff. ¶ 2.)  Yet, the fact that the prosecution apparently entered into a plea deal with one of Petitioner's co-defendants, Suarez (*see* R., at 602:16-603:19) suggests a reasonable probability that, had a plea offer been accepted by Petitioner, it would not have been withdrawn.

Similarly, nothing in the record tends to suggest that, if a plea offer had been presented to the court, it would have been rejected.  To the contrary, the calendar call transcripts seem to indicate that the trial judge had no objection to the case being resolved by a plea bargain.  (*See, e.g.,* 12/3/01 Tr., at 2:22-25 (trial judge responding, "All right," when informed by the prosecutor that offers had been made); 12/3/01 Tr., at 3:24-25 (trial judge advising that "[i]f you think you

18

are working some disposition out, you better work it out before January 2nd").)  The judge's

remarks suggest a reasonable probability that a plea deal would have been accepted by the court.

Finally, there is no dispute that the conviction or sentence under a plea deal of 18 years to

life imprisonment would have been less severe than the term of life imprisonment without parole

to which Petitioner was in fact sentenced.

### C.   Necessity of an Evidentiary Hearing

As the state court's decision either involved an unreasonable application of clearly

established federal law, or was based on an unreasonable determination of the facts in light of the

evidence, *see* 28 U.S.C. § 2254(d), this Court must proceed to consider the ultimate question of

whether Petitioner is in custody in violation of law, *see* 28 U.S.C. § 2254(a), without deference

to the state court's decision, *see Panetti v. Quarterman*, 551 U.S. 930, 948 (2007).

Factual disputes remain regarding whether a plea deal was actually offered to Petitioner

and, if so, the terms of that plea offer; the quality of advice given by counsel about any plea

offer; and the credibility of the various affiants, which cannot adequately be resolved without a

hearing. *See Garcia*, 104 F. App'x at 779-80; *Montes de Oca*, 2007 WL 4591991 at *6-7,

*14-15. These factual disputes remain not due to a lack of diligence on Petitioner's part, but due

to the state court's refusal to hold the hearing Petitioner requested.  Given that Petitioner

exercised diligence, and thus did not "fail[] to develop" the factual basis of his claim, AEDPA

does not bar this Court from holding an evidentiary hearing in this case. *See Michael Williams*,

529 U.S.C. at 437.  Neither is *Pinholster* a barrier, as that case limited the ability of a district

court to hold a hearing only with respect to review under § 2254(d)(1), *see Pinholster*, 131 S. Ct.

at 1398 – an inquiry this Court has undertaken, above, without reference to any evidence other

than what was before the state court.

Accordingly, as a hearing is both permissible for, and necessary to, the resolution of Petitioner's ineffective-assistance-of-counsel claim, this Court will hold an evidentiary hearing to evaluate the credibility of Petitioner and any other witnesses with relevant knowledge and to consider any evidence presented. Subsequent to the hearing, this Court will issue a Report and Recommendation to Judge Schofield as to the appropriate disposition of the Petition, in its entirety.

## CONCLUSION

For the foregoing reasons, counsel are directed to initiate jointly a telephone conference with this Court on November 21, 2013, at 2:00 p.m., at which time this Court will schedule a hearing on Petitioner's ineffective-assistance-of-counsel claim. As Petitioner has now retained counsel for all proceedings herein (Dkt. 12), there is no need for this Court to appoint counsel for purposes of the hearing, and Petitioner's initial application for appointment of counsel (as contained in his Petition (Dkt. 1)) is denied as moot.

Dated: New York, New York
      November 13, 2013

SO ORDERED

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All counsel (via ECF)

20